Gina BREITENFELD, Appellant,

v.

SCHOOL DISTRICT OF CLAYTON,
et al., Respondents,

State of Missouri and Attorney General
Chris Koster, Appellants.

No. SC 92653.

Supreme Court of Missouri,
En Banc.

June 11, 2013.

Solicitor General James R. Layton, Thomas D. Smith and Christopher J. Quinn, Attorney General's Office, Jefferson City, for the State.

Elkin L. Kistner and Sean M. Elam, Bick & Kistner PC, Clayton, for Breitenfeld.

Mark J. Bremer and D. Leo Human, Kohn, Shands, Elbert, Gianoulakis & Giljum LLP, St. Louis, for Clayton School District and Clayton Taxpayers.

Richard B. Walsh Jr. and Evan Z. Reid of Lewis, Rice & Fingersh LC, St. Louis, for Transitional School District.

Joshua M. Schindler, The Schindler Law Firm PC, St. Louis, for St. Louis School District Residents, who filed a brief as friends of the Court.

Melanie Gurley Keeney, Katherine L. Nash and Elizabeth J. Mooney, Tueth, Keeney, Cooper, Mohan & Jackstadt PC, St. Louis, for Cooperating School Districts of Greater St. Louis, which also filed a brief as friends of the Court.

MARY R. RUSSELL, Judge.

■ This appeal follows this Court's remand in *Jane Turner, et al. v. School District of Clayton, et al.,* 318 S.W.3d 660 (Mo. banc 2010). At issue now is whether

the trial court erred in concluding that the "Unaccredited District Tuition Statute," section 167.131,[1] is unenforceable as applied to the defendant school districts [2] because it violates the Hancock Amendment, Missouri Constitution article X, sections 16 to 22.[3] Also at issue is whether the trial court wrongly determined that section 167.131 is unenforceable as applied to the defendant school districts because their compliance with that statute is "impossible."

This Court finds that section 167.131, as it is applied to the defendant school districts involved in this case, does not violate the Hancock Amendment. Further, under the facts of this case, the trial court erred in finding that it would be "impossible" for the defendant school districts to comply with the requirements of section 167.131. Accordingly, the trial court's judgment is reversed, and the case is remanded.

## I. Background

### A. *Turner* prior to remand

Pursuant to section 167.131, "a school district that loses accreditation with the state board of education must pay tuition for any resident pupil who attends an accredited school in another district in the same or an adjoining county." *Turner*, 318 S.W.3d at 664. Section 167.131 also establishes the tuition rate to be paid by the unaccredited district to the accredited district when a student elects to transfer pursuant to the statute.[4]

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. The named defendants in this case are the original defendants from *Turner:* the School District of Clayton (Clayton); the Board of Education of the City of St. Louis (which operates the St. Louis Public School District (SLPS)); and the Transitional School District of the City of St. Louis (the transitional school district), which operated SLPS after it became unaccredited in 2007. After this Court remanded *Turner*, taxpayer residents of the defendant school districts entered this case as intervenors to raise the Hancock Amendment issues, and they named the State of Missouri as a defendant. *Cf. King–Willmann v. Webster Groves Sch. Dist.*, 361 S.W.3d 414 (Mo. banc 2012) (highlighting that taxpayers and not government entities have standing to bring a Hancock violation claim against a statute).

3. The appellants assert that jurisdiction is proper in this Court on the basis that this appeal invokes this Court's exclusive jurisdiction pursuant to Missouri Constitution article V, section 3, because they allege that this case presents a challenge to the constitutional validity of a Missouri statute. But a challenge to a statute premised on the Hancock Amendment's prohibition against unfunded mandates does not invoke this Court's exclusive jurisdiction. Even if an unfunded mandate violating the Hancock Amendment is established, the remedy is not the total invalidation of the statute as unconstitutional but rather the entry of a declaratory judgment that relieves the duty to perform the state-mandated activity or service at issue.

The state does not contest this Court's jurisdiction and, in fact, implores the Court to keep the case even if jurisdiction is lacking. This Court may not obtain jurisdiction of the subject matter of an appeal by consent, waiver, or in the interest of judicial economy. *State v. Nash*, 339 S.W.3d 500, 506–07 (Mo. banc 2011). However, this Court can take transfer of this case before its disposition by the court of appeals because of the general interest or importance of a question involved in the case, or for the purpose of reexamining the existing law. *Id.* at 507. This appeal meets this transfer standard and, accordingly, on its own motion, this Court transfers this case under Missouri Constitution article V, section 10.

4. Section 167.131 states (bolded emphasis in statute removed):

1. The board of education of each district in this state that does not maintain an accredited school pursuant to the authority of the state board of education to classify schools as established in section 161.092, RSMo, shall pay the tuition of and provide transportation consistent with the provisions of section 167.241, RSMo, for each pupil resident therein who attends an ac-

SLPS became unaccredited in 2007, and thereafter it was operated by the special administrative board of the transitional school district.[5] After SLPS became unaccredited,[6] some parents sought to have their children obtain section 167.131 transfers and tuition payments from the transitional school district that would enable them to attend school in Clayton. Both SLPS and Clayton objected to enforcement of section 167.131 to allow the plaintiffs' children to attend Clayton.

In *Turner*, plaintiff parents and children who resided in the transitional school district sought to obtain section 167.131 tuition payments from the transitional school district to pay for the plaintiffs' children's education in Clayton. The plaintiffs asserted that, pursuant to section 167.131, their children were entitled to attend Clayton or one of 21 other accredited school districts in adjoining St. Louis County.

credited school in another district of the same or an adjoining county.
2. The rate of tuition to be charged by the district attended and paid by the sending district is the per pupil cost of maintaining the district's grade level grouping which includes the school attended. The cost of maintaining a grade level grouping shall be determined by the board of education of the district but in no case shall it exceed all amounts spent for teachers' wages, incidental purposes, debt service, maintenance and replacements. The term "debt service," as used in this section, means expenditures for the retirement of bonded indebtedness and expenditures for interest on bonded indebtedness. Per pupil cost of the grade level grouping shall be determined by dividing the cost of maintaining the grade level grouping by the average daily pupil attendance. If there is disagreement as to the amount of tuition to be paid, the facts shall be submitted to the state board of education, and its decision in the matter shall be final. Subject to the limitations of this section, each pupil shall be free to attend the public school of his or her choice.

The trial court entered judgment in favor of the defendant school districts, and the plaintiffs appealed.

This Court in *Turner* reversed the judgment, holding that section 167.131 was applicable to the transitional school district and required that it pay—as the transitional school district operating in the place of the unaccredited SLPS—the plaintiffs' children's tuition costs for attending Clayton. The case was remanded for further proceedings.

**B. Proceedings after remand**

By the time this case was heard on remand, only one *Turner* plaintiff—Gina Breitenfeld—and her two children remained in the litigation.[7] The trial court allowed taxpayers from Clayton and a taxpayer from SLPS to intervene in this case to raise arguments that section 167.131 violates the Hancock Amendment.[8]

5. For simplification, SLPS and the transitional school district are referenced interchangeably in this opinion.

6. SLPS remained unaccredited at the time this case was heard on remand and when it was decided by the trial court. By October 2012, SLPS had regained provisional accreditation, such that section 167.131 became inapplicable from that date forward.

7. Plaintiffs' attorney proffered that certain plaintiffs exited the litigation because they were exhausted by the seemingly never-ending proceedings or because their children had graduated from high school before the case was concluded.

8. The Clayton intervenors claimed that section 167.131 imposes a new or increased activity on Clayton in violation of the Hancock Amendment because it mandates that Clayton, without exercising its own discretion, must educate a new population of students from outside of its district. The Clayton intervenors asserted that the implementation of section 167.131 transfers for SLPS students to attend Clayton would increase Clayton's student population dramatically and that the costs would not be offset by the State.

A consolidated trial on remand was held to address: Breitenfeld's petition [9] seeking a declaration that her two children were entitled under section 167.131 to have their Clayton tuition paid by the transitional school district during certain periods of time when SLPS was unaccredited; the Clayton intervenors' petition seeking a declaratory judgment that section 167.131 is unenforceable because it violates the Hancock Amendment; the SLPS intervenor's petition seeking a declaratory judgment that section 167.131 is unenforceable because it violates the Hancock Amendment; Clayton's counterclaim against Breitenfeld for payment of tuition costs; other pleadings raising Hancock Amendment challenges; and pleadings asserting that the defendant school districts need not comply with the mandates of section 167.131 based on a defense of "impossibility of compliance."

The defendant school districts' evidence on remand related largely to their operational costs and their projected costs associated with complying with section 167.131. Data based on actual section 167.131 transfers was not available at trial because no section 167.131 transfers from SLPS to an accredited school district in St. Louis County actually had occurred.[10]

The school districts' evidence at trial instead included information from the Jones Report, a 2011 statistical study estimating the likelihood that students would transfer under section 167.131 from the unaccredited SLPS to certain adjoining St. Louis County school districts. The report calculated the financial impact the estimated transfers would have on the school districts.[11] It estimated that approximately 15,740 students from the unaccredited SLPS would seek section 167.131 transfers.[12] SLPS and the St. Louis County

The SLPS intervenor argued that section 167.131 imposes new activities as to SLPS in violation of the Hancock Amendment because it mandates that SLPS must pay tuition to another school district chosen by a resident student. The SLPS intervenor also contended that section 167.131 violates the Hancock Amendment because it mandates that SLPS provide out-of-district transportation for students who elect section 167.131 transfers.

9. Breitenfeld filed a petition and second amended petition, and the trial court's judgment referenced them collectively as her petition.

10. None of the plaintiff children in *Turner* were enrolled by Clayton as section 167.131 transfer students because Clayton had decided after SLPS became unaccredited in 2007 that it would not accept SLPS transfer students. The children of the original plaintiffs in *Turner* had enrolled in Clayton pursuant to private tuition agreements that were entered prior to the plaintiffs' suit seeking application of section 167.131 tuition payments. Even after this Court's decision in *Turner*, Clayton determined that it would not accept SLPS transfer students under section 167.131 until *Turner* was fully resolved following remand.

11. The Jones Report was prepared by a university professor. His study asked telephone survey participants to rank by importance seven identified "school selection factors." The participants also were informed about the six St. Louis County school districts with the highest performances on a State assessment test, and they then were asked if one of these districts or another district would be their "first choice."

In challenging the Jones Report at trial, Breitenfeld and the State highlighted concerns about the methodology and statements used in the survey. They challenged the school districts' reliance on the Jones Report, suggesting it was too speculative and not backed by any other research. But a school administrator testified at trial that the Jones Report projections provided the only available information for SLPS and the St. Louis County school districts to use in planning for potential section 167.131 transfers.

12. This estimated number of students who would transfer to St. Louis County schools included transfers by 8,318 students currently enrolled SLPS, and it accounted for transfer choices made by students not currently enrolled in SLPS, including: 1,746 charter

school districts relied on the Jones Report for developing budget projections and for strategic planning related to prospective student enrollment changes from section 167.131 SLPS transfers.[13]

The SLPS superintendent testified at trial that the estimated section 167.131 tuition and transportation costs for the student transfers estimated by the Jones Report could be as high as $262 million.[14] The superintendent stated that it would be impossible for SLPS to maintain or improve its current attendance and academic achievements and adequately educate remaining students if the transfers estimated in the Jones Report occurred.[15]

The trial court also heard testimony from a Clayton school administrator who stated that the estimated student transfers would more than double Clayton's current enrollment of approximately 2,500 students. The acting superintendent for Clayton testified that the district believed that it would be impossible without years of advance planning and construction to accommodate the 3,567 transfer students that the Jones Report estimated would enroll in Clayton under section 167.131.[16]

## C. The trial court's findings

The trial court agreed with the intervenors that section 167.131 was unenforcea-

school students; 2,757 private school students; and 2,248 students from the Voluntary Interdistrict Choice Corporation (an existing program that allows city students to apply for transfers to county schools).

13. The Jones Report projected that the SLPS resident students who would chose section 167.131 transfers would enroll in St. Louis County schools as follows: 3,567 students to Clayton; 1,904 students to the Kirkwood school district; 1,857 students to the Lindbergh school district; 1,763 students to the Rockwood school district; 1,731 students to the Ladue school district; 1,149 students to the Brentwood school district; and 3,769 students to an unknown adjoining district.

14. The SLPS superintendent testified that tuition payments to accredited districts for the projected number of section 167.131 transfer students would cost SLPS $223,790,964.16 annually. This estimated total included a calculation for tuition payable to Clayton for the two Breitenfeld children, which he testified would cost SLPS $40,057.38 annually. He further projected that the transportation costs for all of the student transfers estimated by the Jones Report would cost SLPS $25.6 to $38.4 million annually.

15. The superintendent testified that, based on SLPS's 2011 budget expenditures of $288 million and enrollment of 23,000 students, SLPS would have approximately $26 million remaining to educate the estimated 15,182 students who were not projected to transfer

under section 167.131. He projected that regaining accreditation would be impossible for SLPS if section 167.131 transfers occurred at the levels estimated in the report. His testimony was supported by testimony from a state education department official who stated that it was his experience that a school district would be unable to provide an adequate education to two-thirds of its existing student body after losing 80 percent of its operating budget.

16. Clayton anticipated that, if the Jones Report was correct in estimating that the district would gain 3,567 SLPS transfer students, Clayton would need to build multiple new school buildings, would be forced to develop a mechanism to finance construction and would need to acquire about 50 acres of land (which it thought may not be available in the district). Clayton estimated it would need for four years to complete the needed construction to accommodate its projected enrollment increases outlined in the Jones Report.

With a current bonding capacity of $56 million, Clayton used the Jones Report calculations to estimate that it would need additional bonding capacity to provide $135 million dollars to finance construction and land acquisition and $42.2 million for projected annual operating costs. Clayton's acting superintendent testified that Clayton would find it impossible to adequately educate two-thirds of its existing student body after losing 90 percent of its operating budget.

ble as to the defendant school districts because it was an "unfunded mandate" in violation of the Hancock Amendment. *See Miller v. Dir. of Revenue*, 719 S.W.2d 787, 788–89 (Mo. banc 1986) (discussing the determinations for finding an "unfunded mandate" in violation of the Hancock Amendment). Consistent with the precedent for determining if a statute imposes an "unfunded mandate," the trial court considered whether section 167.131 requires any new or increased activities for local government entities, and it weighed the funding attached to the statute. *See id.* The trial court emphasized that there was no evidence presented that section 167.131 included funding to effectuate the student transfers required pursuant to the statute. After it determined that the section 167.131 "mandate did not include any State funding," the trial court undertook to decide whether section 167.131 requires a new or increased activity or service of the defendant school districts, as compared with their state-mandated activities or services as of the date that voters adopted the Hancock Amendment on November 4, 1980.

In weighing this question, the trial court examined section 167.131, RSMo 1978, which provided that a student *who completed the work of the highest grade offered* in a school district that did not maintain an approved high school that offered work until grade 12 was entitled to have the resident school district pay tuition for the student to attend "an approved high school in another district of the same or an adjoining county . . . where work of one or more higher grades is offered." *See* sec. 167.131, RSMo 1978. *This former version* of section 167.131 also stated that "each

pupil shall be free to attend the school of his or her choice" when transferring under the statute, but it indicated that "*no school shall be required to admit any pupil.*" *See id.* (emphasis added).[17]

The trial court determined that "the passage of [section] 167.131 RSMo (2000) created new and increased activity or service for school districts over and above what was required in 1980 under the old transfer law." It stated:

> [Section] 167.131 RSMo (2000) created the requirement for unaccredited school districts to pay tuition and transportation regardless of any work completed by the transferring students. It also expanded an unaccredited district's activity by requiring payment for a new population of students, from kindergarten to 8th grade. It also appears that this law created a state-administered, district-wide scheme of accreditation that did not exist in 1980.

The trial court concluded that the current version of section 167.131 violated the Hancock Amendment because—"without any state funding"—it would: (1) place an expanded burden on St. Louis taxpayers to pay tuition and transportation for SLPS resident students who would choose to transfer to a St. Louis County school pursuant to section 167.131; (2) require the transitional school district to pay $40,057.38 for the Breitenfeld children's tuition to attend Clayton; (3) place a burden on Clayton taxpayers by requiring Clayton to construct new buildings for a student body that would double in size; and (4) eliminate Clayton's discretion to

17. The trial court discussed that, pursuant to the limitations of the former version of the transfer statute, the two Breitenfeld children would not have had eligibility to transfer under the statute in 1980—as the children had

not yet completed the work of the highest grade offered by SLPS and because Clayton would have had discretion under the former statute to reject their transfer applications.

accept or reject students from unaccredited school districts.

The trial court also determined that it would be "impossible" for the defendant school districts to comply with section 167.131. After finding that section 167.131 could not be enforced to require SLPS to remit tuition payments for the Breitenfeld children's Clayton tuition, the trial court entered judgment in favor of Clayton on the district's counterclaim against Breitenfeld, which sought tuition for her two children. The trial court ordered Breitenfeld to pay Clayton $49,133.33 for tuition owed. The trial court also granted fees and costs in favor of the defendant school districts and the intervenor taxpayers.[18]

The State and Breitenfeld appeal.

## II. Standard of review

■ The arguments on appeal regarding the constitutional validity of section 167.131 are afforded *de novo* review by this Court. *See Sch. Dist. of Kansas City v. State,* 317 S.W.3d 599, 604 (Mo. banc 2010). A statute is presumed to be constitutional, and it will not be declared to violate the Hancock Amendment unless it clearly and undoubtedly violates the con-

stitution. *Id.* The party challenging the validity of a statute bears the burden to demonstrate that it clearly and undoubtedly violates constitutional limitations. *Id.* Arguments asserting that a statute is unconstitutional that rest on speculation and conjecture do not overcome the presumption of constitutionality afforded to the statute. *See Miller,* 719 S.W.2d at 789.

The arguments at issue in this appeal that do not challenge the constitutional validity of section 167.131 each are afforded review consistent with the standards of *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). On these issues, the trial court's judgment will be affirmed on appeal unless there is no substantial evidence to support it, or unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy,* 536 S.W.2d at 32.

## III. Does section 167.131 violate the Hancock Amendment?

The State and Breitenfeld assert that the trial court erred in finding that section 167.131 imposes an "unfunded mandate" in violation of the Hancock Amendment.[19]

18. The Clayton intervenors submitted a request for attorney fees of $228,163.20 and expenses of $63,314.12. The expense amount included the cost of the Jones Report and the report's author's work as their expert, but they maintain that the requested amount only included the fees and costs incurred in pursuing the successful Hancock Amendment challenge. The trial court awarded the Clayton intervenors $291,477.32 for fees and costs pursuant to Missouri Constitution article X, section 23, payable by the State. And it awarded Clayton and the Clayton intervenors $1,905.25 for costs, also payable by the State.

The St. Louis intervenor was awarded $258,951.50 for attorney fees and $3,888.55 for costs pursuant to Missouri Constitution article X, section 23, payable by the State.

Costs were taxed against Breitenfeld and in favor of Clayton in the amount of $966.95.

19. The State and Breitenfeld raise multiple arguments alleging that the trial court erred in concluding that section 167.131 violates the Hancock Amendment. In addition to the arguments addressed in this opinion, they assert that the trial court wrongly implied that the Hancock Amendment requires a line-item funding source when the State enacts a new activity or increases the level of an existing mandated activity. The State also argues that the trial court erred in its findings as to the Hancock Amendment because it failed to focus on how the implementation of section 167.131 transfers between SLPS and Clayton would impact *taxpayers* in those districts, as opposed to how it would impact the political subdivisions. To resolve this case, it is not necessary to undertake an analysis of every Hancock argument presented.

The Hancock Amendment is aimed at "erect[ing] a comprehensive, constitutionally-rooted shield [to] protect taxpayers from government's ability to increase the tax burden above that borne by the taxpayers on November 4, 1980." *Ft. Zumwalt Sch. Dist. v. State*, 896 S.W.2d 918, 921 (Mo. banc 1995). The Hancock Amendment is intended as a "tax and spending lid" for state government, as its "purpose is 'to limit taxes by establishing tax and revenue limits and expenditure limits for the state and other political subdivisions which may not be exceeded without voter approval.'" *Rohrer v. Emmons*, 289 S.W.3d 600, 603 (Mo.App.2009), (quoting *Buchanan v. Kirkpatrick*, 615 S.W.2d 6, 13 (Mo. banc 1981)).

The portions of the Hancock Amendment that are relevant in this case—sections 16 and 21—provide as follows:

> The state is prohibited from requiring any new or expanded activities by counties and other political subdivisions without full state financing, or from shifting the tax burden to counties and other political subdivisions. [Mo. Const., art. X, sec. 16.]
>
> . . .
>
> A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the general assembly or any state agency of counties or other political subdivisions, unless a state appropriation is made and disbursed to pay the county or other political subdivision for any increased costs. [Mo. Const., art. X, sec. 21.]

These sections are not separate and independent limitations on the State, but they instead are aimed at preventing it from circumventing the taxing and spending limitations intended by the Hancock Amendment by forcing political subdivisions to do the taxing and spending that the State cannot.

The plain language of article X, section 21 indicates that it is violated if both: (1) the State requires a new or increased activity or service of political subdivisions; and (2) the political subdivisions experience increased costs in performing that activity or service. *See Miller*, 719 S.W.2d at 788–89. The first prong of this test for an "unfunded mandate" in contravention of the Hancock Amendment is established when the State requires local entities to begin a new mandated activity or to increase the level of an existing activity beyond the level required on November 4, 1980. *See Neske v. City of St. Louis*, 218 S.W.3d 417, 422 (Mo. banc 2007), *overruled on other grounds by King–Willmann v. Webster Groves Sch. Dist.*, 361 S.W.3d 414 (Mo. banc 2012).[20] A new mandated activity or service in violation of the Hancock Amendment is not established when a statute imposes a requirement on governmental entities that requires continuance of an existing activity or service. *See id.* at 423.[21] *Neske* estab-

---

**20.** *Neske* was overruled on grounds not relevant to the discussion in this case, as it was overruled insofar as it suggested that a public entity had standing to raise a Hancock Amendment challenge as a defense to compliance with a statute. *King–Willmann* clarified that Hancock arguments must be raised by taxpayers.

**21.** In *Neske*, a city asserted that section 21 of the Hancock Amendment prevented the State from requiring it to pay city employee retirement system contributions at an amount exceeding the amount the city had paid in 1981. 218 S.W.3d at 423. *Neske* rejected the city's argument because, despite the fact that the dollar amounts certified for the city to contribute were greater than the dollar amounts certified for payment in 1981, the city's requirements to pay were unchanged. *Id.* *Neske* stressed that the city was at all times required to pay the entire amounts certified by the retirement systems' boards of trustees,

lished that, when there is not an alteration to a long-used formula and no mandate to "take on a new responsibility, but only a continued responsibility for ... an existing activity according to a previously-existing formula, there is no Hancock violation." *See id.*[22] Additionally, the plain language of article X, section 21 prohibits an unfunded mandate for an increased *level* of an existing activity or service. The indication that an increased *level* is prohibited is different than prohibiting any increase in cost because there are more requests for performance of an existing activity or service—what for ease of reference will be hereinafter referred to as an increased *"frequency"* of undertaking a given activity or service.[23]

The second prong of the test for proving an "unfunded mandate" is established when political subdivisions experience increased costs in performing the new activity or service at issue because the State provides insufficient funding to offset the full costs of compliance. *See City of Jefferson v. Missouri Dep't of Natural Res.,* 863 S.W.2d 844, 849 (Mo. banc 1993).

In this case, the State and Breitenfeld differ slightly in their arguments as to why the trial court erred in finding that section 167.131 results in an "unfunded mandate." Breitenfeld argues that section 167.131 does not create a new or increased activity or service within the meaning of the Hancock Amendment. She maintains that the mandates of section 167.131 fit within the existing mandate that school districts have to provide a free public education to eligible students. Additionally, she asserts that the intervenors failed to prove any increased costs would be incurred by complying with the mandates of section 167.131.

The State contends that the trial court wrongly determined a Hancock violation as to SLPS because SLPS already has a duty to educate its resident students that preexists the mandates of section 167.131. The

---

regardless of the dollar amount, such that there was no new or increased activity at issue. *Neske* stated: "The increased cost of funding the [retirement systems] is *not an expansion of the City's long-existing responsibility.*" *Id.* (emphasis added) (discussing that there was no challenge to the actuarial formula used to calculate the city's payments and that there was inevitable dollar amount fluctuation over the years, and "Hancock's mission to control taxes is not thwarted if the actuarial formula yields increased certified amounts payable" to the retirement systems; noting that "[t]he certified amount derived from the actuarial calculations is not the measure of whether Hancock is violated[, rather] [t]he question is whether the City has been mandated to bear new responsibilities in relation to this activity," and it had not been so mandated).

22. *See also State ex rel. Pub. Defender Comm'n v. Cnty. Court of Greene Cnty.,* 667 S.W.2d 409, 414 (Mo. banc 1984) (finding there was no new or increased activity in violation of Hancock when the county's existing statutory obligation was not changed by the challenged

action); *cf. also Boone Cnty. Court v. State,* 631 S.W.2d 321, 327 (Mo.1982) (Bardgett, J., dissenting) (later superseded by statute but discussing in the dissent that something long-done by a state entity is not what Hancock is about, explaining: "The [challenged] statute does not require any new activity or any activity ... [n]or, in my opinion, is there any increase in the activity required of the county. [The challenged] statute does not require any new service beyond that which is required by the previously existing statutes relating to the duties of a collector. The statute does not require any increase in the level of any activity or service performed by the collector or the county beyond that required by previously existing law. In fact, the statute does not change any service or activity to be performed by the collector or the county at all.").

23. To the extent that *School District of Kansas City v. State,* 317 S.W.3d 599, 611 (Mo. banc 2010), suggests in *dicta* that an increased cost of performing an existing activity or service itself can result in a Hancock violation, it is incorrect.

State posits that section 167.131, therefore, imposes nothing "new" as to SLPS's provision of educational services. As to Clayton, the State argues that the Clayton intervenors did not prove a Hancock violation because they failed to show that there was insufficient funding to support the new mandates for providing educational services to SLPS transfer students. The State also asserts that the Clayton intervenors failed to show that the section 167.131 mandates would put an increased burden on Clayton taxpayers. Further, the State concedes that the student transportation provisions of section 167.131 impose a "new" duty on SLPS, but it argues that the SLPS intervenor failed to prove that the "new" transportation mandates were "unfunded."

### A. The mandated educational requirements of section 167.131 are not "new" or "increased"

■■■ This Court agrees with Breitenfeld that there is nothing "new"—for purposes of applying the Hancock Amendment—about either SLPS or Clayton providing eligible students in grades K–12 a free public education.[24] Missouri's Constitution has long-reflected that it is the State's intent to provide a free public education to all persons less than 21 years of age in order to promote "[a] general diffusion of knowledge and intelligence." Missouri Constitution article IX, section 1(a). And a number of statutes related to this constitutional directive have been enacted throughout Missouri's history, including the enactment in 1963 of section 160.051.1, which continues to provide the statutory language that es-

tablishes Missouri's modern-day public school system:

> A system of free public schools is established throughout the state for the gratuitous instruction of persons between the ages of five and twenty-one years. Any child whose fifth birthday occurs before the first day of August shall be deemed to have attained the age of five years at the commencement of the school year beginning in that calendar year or at the commencement of the summer school session immediately prior to the school term beginning in the school year beginning in that calendar year, whichever is earlier, for the purpose of apportioning state school funds and for all other purposes.

Statutes enacted by the General Assembly have provided for establishment of school districts and have vested these districts with certain powers and duties to carry out the constitutional mandate for a free public education. *Sch. Dist. of Oakland v. Sch. Dist. of Joplin*, 340 Mo. 779, 102 S.W.2d 909, 910 (1937). This Court discussed school districts in *School District of Oakland* as follows:

> The school districts are organized as separate legal entities. They are public corporations, form an integral part of the state, and constitute that arm or instrumentality thereof discharging the constitutionally [e]ntrusted governmental function of imparting knowledge and intelligence to the youth of the state that the rights and liberties of the people be preserved. They are supported by revenues derived from taxes collected within their respective territorial jurisdictions

---

**24.** The provision of public education in Missouri far predates the enactment of the Hancock Amendment, as public education in this State has its origins in Missouri's territorial government charter enacted in 1812. The territorial charter stated: "[K]nowledge, be-

ing necessary to good government and the happiness of mankind, schools and the means of public education shall be encouraged and provided for[.]" Territorial Laws of Missouri, vol. I, ch. IV, sec. 14 (page 13) (approved June 4, 1812).

and the [general] revenues of the state collected from all parts of the state. These taxes and such property as they may be converted into occupy the legal status of public property and are not the private property of the school district by which they may be held or in which they may be located.

*Id.* (internal citations omitted).

The court of appeals previously has stated: "The right of children, of and within the prescribed school age, to attend the public school established *in their district* for them is not a privilege dependent upon the discretion of any one, but is a fundamental right, which cannot be denied, except for the general welfare." *State ex rel. Roberts v. Wilson,* 221 Mo.App. 9, 297 S.W. 419, 420 (1927) (emphasis added), citing *Lehew v. Brummell,* 103 Mo. 546, 15 S.W. 765 (1891). And *State ex rel. Halbert v. Clymer* indicated the deference given to district boundaries by courts, as it discussed that "[w]hile [a public education]

statute must be liberally construed,[ [25] ] . . . it would not be right to permit children living in districts whose taxpayers have neglected or refused to maintain schools to have the benefits free of charge, of schools in districts wherein the taxpayers have burdened themselves to erect schoolhouses, employ competent teachers, and maintain schools." 164 Mo.App. 671, 147 S.W. 1119, 1120 (1912).

The statutes that were the basis of the holdings in *Roberts* and *Halbert* respecting school district boundaries, however, have been supplanted by the legislature's enactment of various statutory provisions that permit certain children who are eligible for a free public education to have the opportunity to obtain that education outside of their school district of residence. For example, section 167.020, RSMo Supp.2012, provides for proof of residency requirements, but it outlines residency exemptions for certain categories of students.[26]

---

**25.** *Halbert* explained the need for liberal construction of education statutes as follows:

> The policy of this state is to educate and to furnish free of charge good schools for all children of school age, and even to compel the attendance of children thereto. . . . [Considering the constitutional provision providing for public education], [i]t is therefore the duty of the courts to liberally construe our statutes relating to schools, and in such a manner as to open, and not to close, the doors of the schools against the children of the state.

147 S.W. 1119, 1120 (Mo.App. 1912).

The education-out-of-district issue that *Halbert* described as something that "would not be right" was considered in the context of the statutes as they existed at the time of that case. The statutes governing this case are not the same as those existing in 1912 and reflect changes of public policy, which is in the province of the General Assembly. This Court's task in this case cannot be to determine the "fairness" of section 167.131 as a matter of public policy, but rather it is to assess whether the statute violates the Hancock Amendment by imposing an "unfunded mandate."

If the legislature has crafted section 167.131 "in such a manner as to open, and not to close, the doors" of Clayton to the resident students of SLPS without violating the Hancock Amendment, then the intervenors' Hancock claims must fail, regardless of any policy rationales advanced in the parties' arguments.

**26.** Section 167.020.6 outlines categories of students who are exempt from section 167.020.2's proof of residency requirements: a pupil who is a homeless child or youth; or a pupil attending a school not in the pupil's district of residence as a participant in an interdistrict transfer program established under a court-ordered desegregation program; a pupil who is a ward of the state and who has been placed in a residential care facility by state officials; a pupil who has been placed in a residential care facility due to a mental illness or developmental disability; a pupil attending a school pursuant to sections 167.121 and 167.151; a pupil placed in a residential facility by a juvenile division; a pupil with a disability identified under state eligibility criteria if the student is in the district for reasons other than accessing the dis-

Similarly, section 167.131 is a statutory enactment that permits nonresident students the opportunity to be educated in a place outside of his or her school district of residence.

The mandate that has long-existed for Missouri's school districts is to provide a free public education to all students who attend, even when the students are non-residents who are permitted under statutory directives to attend an out-of-district school. Nothing in section 167.131 alters the basic mandate of SLPS and Clayton that directs their operation of K–12 schools. In 1980, before the enactment of the Hancock Amendment, these school districts were providing K–12 educational services to eligible students, and they simply would be continuing to provide those services even if section 167.131 transfers were effectuated. As such, after considering the preexisting mandates for Missouri's schools prior to the challenged version of section 167.131, the statute does not violate the Hancock Amendment if it is applied to allow SLPS resident students to attend accredited adjoining county schools such as Clayton.

Moreover, there is nothing "increased" for purposes of applying the Hancock Amendment if section 167.131 allows SLPS resident students an opportunity to attend Clayton if SLPS is unaccredited. That pursuant to various statutory provisions students can change their school cannot be said to be an "increase" in the student population of the receiving school for purposes of applying the Hancock Amendment. Clayton experiences an addition to its student population if a K–12 student from SLPS chooses to attend Clayton pursuant to section 167.131, but this does not alter the *level* of K–12 educational services that Clayton currently provides. Further, no party suggests that the state's proportionate contribution to state-mandated elements of the costs of the students' education is reduced for those students who chose to attend Clayton rather than SLPS.

These facts distinguish this case from this Court's prior decision in *Rolla 31 School District v. State*, 837 S.W.2d 1 (Mo. banc 1992). In *Rolla 31*, a Hancock "unfunded mandate" violation was found when the State mandated that school districts had to provide special education and related services for disabled three-and four-year-olds in their districts starting in the fall of 1991. 837 S.W.2d at 6–7. But the statute at issue in *Rolla 31* did not provide the full funding that school districts needed to implement new educational services for the new group of students. *Id.*

The new population of preschoolers who were mandated to be provided educational services at issue in *Rolla 31* is distinguishable from the K–12 population at issue in section 167.131 transfers. *Rolla 31* concerned a demographic category of students who never before had been provided free

trict's educational program; or a pupil attending a regional or cooperative alternative education program or an alternative education program on a contractual basis. *Cf.* sections 167.020.2 and 167.020.6.

Section 167.121, RSMo Supp.2012, provides that a student can attend a district outside of the district of residence in cases of unusual or unreasonable transportation hardship; it also allows attendance at the virtual school for students residing in unaccredited or provisionally accredited school districts. Section 167.151, RSMo Supp.2012, provides for the admission of nonresident pupils in certain cases when: there is a discretionary agreement entered with the school district; a child has parents who do not contribute to his or her support or has suffered the death of a parent or parents; parents of the student own property and remit school taxes in a district that is not their primary place of residence and are willing to pay any necessary differences in tuition costs; certain agricultural-land owning requirements are met and the student has a choice of districts to attend; and a student's parent is employed by a school district where the family does not reside.

public educational services by the school district and was a requirement that applied to all three- and four-year-olds in all school districts. In contrast, the section 167.131 transfer provisions challenged by the intervenors concern SLPS resident students who already are entitled to a free public education from SLPS regardless of the application of section 167.131. The group of students at issue here can be placed into existing educational services offered at Clayton or other receiving accredited school districts. Unlike in *Rolla 31*, this case does not involve a wholly new student demographic.

Even though Clayton might gain in its student population as a consequence of enforcement of section 167.131, a Hancock violation is not shown because Clayton would continue to be engaged in its existing activities and services of operating schools for students in grades K–12. The Hancock Amendment is not violated if Clayton educates SLPS section 167.131 transfer students because the *level* of services provided (K–12) by Clayton is not changed, even if the district provides the services to more students—in effect, with greater *frequency*—if the statute is applied.[27]

Because section 167.131 imposes nothing "new" or "increased" for Hancock purposes as to the defendant school districts' provision of K–12 educational services, the trial court erred in determining that the statute creates an "unfunded mandate" for providing educational services.

## B. Hancock does not prohibit local-to-local burden-shifting of an existing activity or service

■ As discussed above, in section 167.131, the State does not impose a new or increased activity or service as to the provision of education for the students eligible for section 167.131 transfers. Instead, it merely shifts the responsibility for an existing activity or service among local political subdivisions. The Hancock Amendment does not prevent this local-to-local shifting of responsibilities because the amendment is not intended to be applied to prevent a statute's reallocation of responsibilities among political subdivisions. Instead, as noted above, the Hancock Amendment's aim is to prohibit burden-shifting from the State to a local entity. *See Rohrer*, 289 S.W.3d at 603. This conclusion is compelled by the language of article X, sections 16 and 21, which prohibits the State from shifting the tax burden to "counties and other political subdivisions." The use of the plural—counties and subdivisions—indicates that the imposition of new and increased services and activities is to be judged statewide rather than as a shift of the burden from one individual county or political subdivision to another. This interpretation also is supported by the overall purpose of the Hancock Amendment to prevent the State from avoiding taxation and spending limitations by shifting its responsibilities to local governments.

■ Here, the total number of children eligible to be educated statewide is not expanded by section 167.131. The only change is to reallocate responsibilities for educating some children among school districts. This is not an action prohibited by the Hancock Amendment. Nothing in article X, sections 16 or 21 prohibits the

---

27. Clayton notes that it provides additional services at greater costs than does SLPS. But those additional costs are not state-mandated but rather are undertaken at Clayton's discretion. While beneficial and commendable, discretionary education spending is not subject to Hancock analysis insofar as it is not mandated by the State.

State from reallocating existing state-mandated local burdens among local entities.

Section 167.131 does not shift a State tax burden to a local entity, but instead it shifts burdens among local entities in that it reallocates the existing educational responsibilities of the sending and receiving school districts of section 167.131 transfer students. This local-to-local reallocation of existing educational activities pursuant to section 167.131 is not barred by the Hancock Amendment.

In *Berry v. State*, this Court heard a Hancock challenge from a group of cities that believed that new provisions for a revised tax distribution formula wrongly would shift the tax burden to them as opposed to other cities. *See* 908 S.W.2d 682, 685 (Mo. banc 1995). This Court, in rejecting the cities' arguments, stressed that "[a]rticle X, [section] 16 prohibits 'the state' from shifting the tax burden *from itself* to counties and other political subdivisions [, and] [a]rticle X, [section] 21 likewise prohibits 'the state' from requiring new or increased operations by local governments." *Id.* (emphasis added) (internal citations omitted). *Berry* found that there was no Hancock violation in that case because the Hancock challengers failed to show that the State was "shifting its tax burden to the . . . cities [or] requiring new or increased levels of operation by the . . . cities." *Id.*

Moreover, no argument is advanced by the parties that section 167.131 threatens the Hancock Amendment's purpose by attempting to circumvent its taxation and spending limitations imposed on the State. To the extent that section 167.131 shifts a preexisting mandate for educating children from an unaccredited district to an accredited district, the purpose of Hancock is not fundamentally violated. Accordingly, the intervenors fail to show a Hancock violation as to section 167.131 reassigning among school districts the long-existing mandates for providing public education to eligible school-aged children.

## C. The transportation mandates of section 167.131 are "new"

■ Beyond section 167.131's provisions related to educational services, section 167.131 also outlines mandates for transportation that is to be provided to students who choose section 167.131 transfers.

The portion of section 167.131 related to transportation provides that an unaccredited school "shall . . . provide transportation consistent with the provisions of section 167.241 for each pupil resident therein who attends an accredited school in another district of the same or adjoining county[.]" Section 167.241 provides (emphasis added):

Transportation for pupils whose tuition the district of residence is required to pay by section 167.131 or who are assigned as provided in section 167.121 shall be provided by the district of residence; however, in the case of pupils covered by section 167.131, *the district of residence shall be required to provide transportation only to school districts accredited by the state board of education pursuant to the authority of the state board of education to classify schools as established in section 161.092, RSMo, and those school districts designated by the board of education of the district of residence.*

The language indicating that transportation for section 167.131 transfer students shall be provided to school districts "designated by the board of education of the district of residence" limits the transportation mandate of section 167.131. Rather than select any of the adjoining accredited school districts for a section 167.131 transfer, a section 167.131 transfer student who needs transportation services must confine

his or her transfer selection to a school district designated by the district of residence.

Even considering this limitation, however, the State concedes that the transportation requirements attached to section 167.131 transfers are "new" mandates for purposes of applying the Hancock Amendment. And this Court agrees that the transportation provisions of section 167.131 mandate to SLPS a "new activity or increase the level of an existing activity or service" for purposes of applying the Hancock Amendment.

Since 1963, section 167.231 [28] has provided for transportation of public school students, and it states in relevant part (emphasis added):

1. *Within* all school districts *except metropolitan districts* the board of education shall provide transportation to and from school for all pupils living more than three and one-half miles from school and may provide transportation for all pupils. State aid for transportation shall be paid as provided in section 163.161, RSMo, only on the basis of the cost of pupil transportation for those pupils living one mile or more from school, including transportation provided to and from publicly operated university laboratory schools. The board of education may provide transportation for pupils living less than one mile from school at the expense of the district and may prescribe reasonable rules and regulations as to eligibility of pupils for transportation

. . .

3. The board of education of any school district may provide transportation to and from school for any public school

pupil not otherwise eligible for transportation under the provisions of state law, and may prescribe reasonable rules and regulations as to eligibility for transportation, if the parents or guardian of the pupil agree in writing to pay the actual cost of transporting the pupil. . . .

Considering section 167.231, the transportation mandates of section 167.131 are "new" insofar as they alter the statutory provision of providing transportation "within" a school district and require the unaccredited school district to provide section 167.131 transfer students transportation to out-of-district schools. Moreover, in the case of SLPS, the "new" mandates of section 167.131 are even more stark, as SLPS is exempt from the transportation provisions of section 167.231 insofar as that statute exempts a "metropolitan district," which section 160.011, RSMo Supp. 2012, defines as "any school district the boundaries of which are coterminous with the limits of any city which is not within a county."

As explained above, however, proving a Hancock violation requires more than simply showing a statute mandates a "new" or "increased" activity. There also must be proof that the mandate is indeed "unfunded." *See City of Jefferson,* 863 S.W.2d at 849 (explaining that there must be an increased cost in performing the new activity or service that is not offset by sufficient State funding for there to be an "unfunded mandate" violating the Hancock Amendment).

■ Although the State concedes that the section 167.131 transportation mandates are "new" for Hancock purposes, it maintains that the SLPS intervenor failed to prove that these mandates violate the

**28.** References to section 167.231 are to RSMo Supp.2012, which provides the current ver-

sion of this statute.

Hancock Amendment by imposing increased costs on SLPS taxpayers. It is correct in its argument that the record is not sufficient to support this finding.

The State is the major source of monies for transporting public education students. *See* section 163.161.1.[29] Without having any "designated" accredited districts for purposes of effectuating the transportation mandates of section 167.131, SLPS is left with only speculative evidence related to the costs of compliance with section 167.131's transportation mandates and whether the new mandates would cause SLPS to experience unfunded increased costs. Evidence that is merely speculative cannot support a finding of an "unfunded mandate" in violation of the Hancock Amendment. *See Sch. Dist. of Kansas City,* 317 S.W.3d at 611 (explaining that proof of an "unfunded mandate" requires "specific proof of new or increased duties and increased expenses, and these elements cannot be established by mere common sense, or speculation and conjecture" (internal quotations omitted)).

As the State notes, calculating the transportation costs associated with the mandates of section 167.131 would require information about the distances from which students choosing section 167.131 transfers live from "designated" schools and would require a comparison of the current costs of transporting those students to a SLPS school as compared to a section 167.131 transfer school. Because the evidence re-

lied on at trial by the intervenor was so speculative, it cannot be the basis for a finding that section 167.131 violates the Hancock Amendment.

For these reasons, the trial court erred in finding an "unfunded mandate" in regards to section 167.131's transportation provisions.

## IV. An "impossibility" defense was not an affirmative defense available to the defendant school districts

In defending against the enforcement of section 167.131, the defendant school districts also argued at trial that the statute should not be enforced because compliance with its mandates will be "impossible."

Clayton maintains that it would be "impossible" for it to provide the educational facilities and resources necessary to educate the potentially thousands of additional students the Jones Report projected would avail themselves of section 167.131 transfers if the statute was enforced against SLPS and Clayton. SLPS maintains that its compliance with effectuating section 167.131 transfers would be "impossible" in that the district could not afford to pay the costs associated with effecting transfers for the thousands of students projected to request transfers under the Jones Report. SLPS argues that its compliance with section 167.131 would deplete its resources that are necessary to meet its obligations

---

**29.** Section 163.161.1 provides:

Any school district which makes provision for transporting pupils as provided in section 162.621, RSMo, and sections 167.231 and 167.241, RSMo, shall receive state aid for the ensuing year for such transportation on the basis of the cost of pupil transportation services provided the current year. A district shall receive, pursuant to section 163.031, an amount not greater than seventy-five percent of the allowable costs of providing pupil transportation services to and

from school and to and from public accredited vocational courses, and shall not receive an amount per pupil greater than one hundred twenty-five percent of the state average approved cost per pupil transported the second preceding school year, except when the state board of education determines that sufficient circumstances exist to authorize amounts in excess of the one hundred twenty-five percent of the state average approved cost per pupil transported the second previous year.

to its students who would remain in SLPS schools.

The trial court agreed with the defendant school districts' "impossibility" defense. It found that their compliance with section 167.131 would be "impossible," and it found that section 167.131 could not be enforced against them and was of "no force and effect."

The State and Breitenfeld both assert that the trial court erred in accepting the "impossibility" arguments offered by the defendant school districts. They contend that there is no affirmative defense of "impossibility" that was available to the defendant school districts to allow them to refuse compliance with section 167.131. The State and Breitenfeld are correct.

 The "impossibility" arguments that the defendant school districts raised against the enforcement of section 167.131 echo the doctrine of impossibility (or impracticality) that typically is applied in the realm of contract law.[30] In the context of contracts, "impossibility" is explained as follows: "If a party, by contract, is obligated to a performance that is possible to be performed, the party must make good unless performance is rendered impossible by an Act of God, the law, or the other party." *Farmers' Elec. Co-op., Inc. v. Missouri Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. banc 1998). This concept, however, is not applied unless the party arguing

an "impossibility" defense has demonstrated that virtually every action possible to promote compliance with the contract has been performed. *Id.* ("A party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract."); *see also Bolz v. Hatfield*, 41 S.W.3d 566, 573 (Mo.App. 2001). This reflects the admonition that "[a] party cannot by its own act place itself in a position to be unable to perform a contract, then plead that inability to perform as an excuse for nonperformance." *Farmers' Elec.*, 977 S.W.2d at 271.

 The defendant school districts argue that this Court should permit them to use a defense of impossibility as developed in the realm of contract performance and allow them to use the defense as a shield protecting them from compliance with a statutory provision that they believe imposes on them a duty that is impracticable or impossible. They argue that *George v. Quincy, Omaha & K.C.R. Co.*, 179 Mo. App. 283, 167 S.W. 153, 156 (1914), supports the general rule that "if a statute is such that it is 'impossible to comply with its provisions, it will be held to be of no force and effect.'" They also cite *Egenreither ex rel. Egenreither v. Carter*, 23 S.W.3d 641, 646 (Mo.App.2000), for the proposition that "considerations of safety,

---

**30.** Restatement (Second) of Contracts § 261 (1981), provides:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

The section illustrations for this statement provide:

Although the rule stated in this Section is sometimes phrased in terms of "impossibili-

ty,".... [t]his Section ... uses "impracticable[.]".... Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved. .... However, "impracticability" means more than "impracticality." A mere change in the degree of difficulty or expense ... does not amount to impracticability.... Furthermore, a party is expected to use reasonable efforts to surmount obstacles to performance (see § 205), and a performance is impracticable only if it is so in spite of such efforts.

emergency conditions, or impossibility of compliance may constitute valid excuses for noncompliance with a statute." But, even assuming for purposes of this argument that the defendant school districts are correct that this Court should apply an affirmative "impossibility" defense to excuse a local government entity from commencing compliance with a state mandate in these circumstances, their argument has no application here due to the fact that en masse section 167.131 transfers are not looming for these districts. The fact that SLPS now has received provisional accreditation means that this current case is narrowed in its scope to Breitenfeld's two children, who already attend Clayton.

As conceded in the State's brief, "[i]f Clayton cannot accommodate the 1000th student at its tuition rate, there might be an 'impossibility' defense when the 1000th student tries to enroll, but there is no such defense today." While there is certainly not a magic number as to when such a concession might be true, it is clear that providing a section 167.131 transfer opportunity to the two Breitenfeld children does not yield the "impossibilities" claimed by the defendant school districts, nor does any party contend otherwise.

For this reason, this Court need not reach the issue of whether the trial court's assessment of "impossibility" reflects a plausible determination that the defendant school districts have, as of now, "demonstrated that virtually every action possible to promote compliance with the contract has been performed." *See Farmers' Elec.,* 977 S.W.2d at 271. This issue was based on facts—attendance of thousands of new students—that simply cannot occur now. This Court rejects Clayton and SLPS's suggestion that this Court nonetheless should give an advisory opinion about this issue because it may arise again in the future. This Court further rejects the argument that this issue will evade review if not addressed here.

For these reasons, this Court reverses the trial court's acceptance of the "impossibility" defenses advanced by the defendant school districts.

## V. The intervenors properly were permitted to intervene

Breitenfeld argues that the trial court erred in allowing the intervenors to intervene to raise their Hancock violation claims. She asserts that the intervenors failed to show that they were entitled to intervene pursuant to Rule 52.12, which governs intervention.[31] Breitenfeld contends that the intervention rule provisions did not support the intervenors' request to intervene in this case because nothing in the Hancock Amendment created a right for the taxpayers to intervene on remand in the underlying litigation that had been proceeding for years and because the intervenors did not meet the requirements for permissive intervention under Rule 52.12(b).

---

**31.** Rule 52.12 provides in relevant part:
 **(a) Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this state confers an unconditional right to intervene or (2) when the applicant claims an interest relating to the property or transaction that is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 **(b) Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common[.] . . .

This Court has stated the standard of review for a claim that intervention was improper as follows:

A trial court's decision regarding intervention as a matter of right will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. This Court reviews permissive intervention for abuse of discretion. Intervention generally should be allowed with considerable liberality.

*Johnson v. State,* 366 S.W.3d 11, 20 (Mo. banc 2012) (internal quotations and citations omitted).

■ Considering this standard of review, the trial court cannot be convicted of error for allowing the intervenors to bring their Hancock claims. Originally, the school districts advanced Hancock arguments, but after the decision in *King–Willmann,* it was clear that taxpayers and not the school districts had to advance the Hancock challenges to section 167.131. At the time of intervention, the intervenors' claims were in common with the main ac-

tion as required for permissive intervention under Rule 52.12(b)(2). The trial court did not abuse its discretion in sustaining the motion to intervene.

## VI. The intervenors' attorney fees awards are reversed

The intervenors were awarded attorney fees in this matter after the trial court found the Hancock Amendment claims in their favor. Because this opinion reverses the trial court's judgment on the issues concerning the Hancock Amendment, the intervenors are not entitled to an award of attorney fees reflecting a successful Hancock Amendment challenge. The trial court's judgments awarding the intervenors' attorney fees are reversed.

## VII. The tuition due to Clayton must be recalculated on remand

Breitenfeld also argues that the trial court erred in ordering that she pay Clayton unpaid tuition costs for her two children.[32] To the extent that the trial court's judgment regarding the tuition issue was

---

32. The Breitenfeld children never have attended SLPS, as they attended private schools until they attended Clayton. Clayton brought a counterclaim against Breitenfeld in this case to collect the tuition that it contended she owed.

During the 2007–2008 school year, Breitenfeld entered a private tuition agreement with Clayton. *Turner* indicated that there is no entitlement to a tuition reimbursement for Breitenfeld for the 2007–2008 school year because she had enrolled her children in Clayton and entered a tuition agreement before commencing her section 167.131 litigation. It appears that, at some points in time after *Turner* was commenced, the Breitenfelds actually resided in Clayton—as there is no claim at issue for the children's Clayton tuition for the 2008–2009 school year, and the parties stipulated at the trial on remand that the Breitenfelds had resided in Clayton for two-thirds of the 2009–2010 school year and had resided in SLPS for only the remaining one-

third of that school year. Breitenfeld submitted "residency affidavits" to Clayton that she resided in the district and would remit tuition payments if she did not live in the district. During the 2010–2011 and 2011–2012 school years, however, the Breitenfelds again resided in SLPS and continued to attend Clayton. Breitenfeld maintains that, regardless of the "residency affidavits" she had signed, the parties stipulated that, during the children's residency in SLPS, they continued to attend Clayton pursuant to Breitenfeld's claims that section 167.131 should be applied.

Because this litigation has been ongoing, the Breitenfelds have not yet paid any Clayton tuition for the 2009–2012 school years. The trial court indicated that Breitenfeld owed Clayton tuition totaling $49,133.33, and it ordered her to pay that amount after finding that section 167.131 cannot be enforced in this case. The trial court, however, did not calculate the tuition costs using the tuition formula established in section 167.131.

premised on its belief that section 167.131 was not enforceable, its tuition reimbursement judgment must be reversed. The trial court did not address to what extent, if any, Breitenfeld would owe unpaid tuition costs for her two children if the defendant school districts had not prevailed in their assertions that section 167.131 should not be enforced against them. This case is remanded so that the trial court can enter a tuition reimbursement order that is consistent with this opinion.

## VIII. Conclusion

For the foregoing reasons, the trial court's judgment is reversed and this cause is remanded.

All concur.