**CITY OF NORMANDY, et al.,
Respondents/Cross-
Appellants,**

v.

**Eric GREITENS, et al.,
Appellants/Cross-
Respondents.**

No. SC 95624

Supreme Court of Missouri,
en banc.

Opinion issued May 16, 2017

The state was represented by J. Andrew Hirth and Emily A. Wales of the attorney general's office in Jefferson City, (573) 751-3321.

The municipalities and taxpayers were represented by Sam J. Alton of SJAlton Law LLC in St. Louis, (314) 961-4878; and David H. Pittinsky and Matther I. Vahey of Ballard Spahr LLP in Philadelphia, Pennsylvania, (215) 665-8500.

Mary R. Russell, Judge

When the General Assembly chooses to pass a special law, the State can preserve the law from constitutional infirmity by offering evidence of substantial justification if challenged in court. *City of DeSoto v. Nixon*, 476 S.W.3d 282, 287 (Mo. banc 2016). The State failed to offer any evidence in the trial court of a substantial justification for the special laws in Senate Bill 5 ("SB 5") that were passed by the General Assembly in 2015. Consequently, the challenged provisions of SB 5 violate the Missouri Constitution's special law prohibition.

Twelve municipalities in St. Louis County, along with two taxpayers (referred to collectively as "Plaintiffs"), filed a petition against the Governor, the Attorney General, the Auditor, and the Director of Revenue (referred to collectively as the "State") for declaratory judgment alleging that provisions of SB 5 violate the Missouri Constitution, including the special laws provision in article III, section 40(30), the Hancock Amendment in article X, sections 16 and 21, and five other constitutional claims.

Of course, special laws like this may be passed by the General Assembly in the future and can survive a special law challenge as long as evidence of substantial justification is offered in the trial court. Because the State failed to present any evidence of substantial justification for enacting either section 67.287,[1] in its entirety, or section 479.359.2, insofar as it creates a separate cap on counties with a charter form of government and with more than 950,000 inhabitants, they are special laws. The statutes target municipalities in one political subdivision: St. Louis County. The trial court's judgment permanently enjoining the State from enforcing these provisions is, therefore, affirmed.

Section 479.359.2, insofar as it provides "except that any county with a charter form of government and with more than nine hundred fifty thousand inhabitants and any city, town, or village with boundaries found within such county shall be reduced from thirty percent to twelve and one-half percent," is severed from the rest of section 479.359.2. By severing this language, section 479.359.2 imposes a uniform cap on fines, bond forfeitures, and court costs of 20 percent statewide.

This Court reverses the trial court's judgment that sections 67.287 and 479.359.3 are Hancock violations as these claims are not ripe for review because the General Assembly has until August 28,

---

1. All statutory citations are to RSMo Supp. 2015 unless otherwise indicated.

2021, to appropriate funds, and the alleged increased duty is *de minimis.* The trial court's dismissal of the Plaintiffs' other constitutional claims is affirmed. In total, the trial court's judgment is affirmed in part and reversed in part.[2]

### Facts and Procedural Background

Over the last two decades, the General Assembly has passed various limitations on the amount of revenue municipalities may generate from traffic fines. The first limitation, known as the "Macks Creek Law," was enacted in 1995. Sec. 302.341. It prohibited any city, town, or village from receiving more than 45 percent of its total annual revenue from fines for traffic violations. *Id.* Excess revenue would be remitted to the state's department of revenue and distributed to the county's schools. *Id.* The General Assembly reduced this cap from 45 to 35 percent in 2009 and to 30 percent in 2013. Sec. 302.341.2, RSMo Supp. 2009; sec. 302.341.2, RSMo Supp. 2013. The 2013 amendment further required an accounting of the percentage of general operating revenue that came from traffic violations be included in the annual financial report. *Id.*

In 2015, the General Assembly passed SB 5 and the Governor signed it into law. The bill moved the Macks Creek Law from section 302.341.2 to section 479.359 and requires every county, city, town, and village to

> annually calculate the percentage of its annual general operating revenue received from fines, *bond forfeitures,* and court costs for *minor* traffic violations, including amended charges *for any municipal ordinance violations and minor traffic violations, whether the violation was prosecuted in municipal court, associate circuit court, or circuit court,*

> *occurring within the county, city, town, or village.*

Sec. 479.359.1 (emphasized to show changes from the previous version). SB 5 also lowered the percentage cap from 30 to 20 percent. Sec. 479.359.2. The General Assembly created one exception to the new 20-percent cap: "any county *with a charter form of government and with more than nine hundred fifty thousand inhabitants* and any city, town, or village with boundaries found within such county shall be reduced from thirty percent to twelve and one-half percent." *Id.* (emphasis added).

In addition, section 479.359.3 now requires all counties, cities, towns, and villages to submit an addendum with their annual financial report to the state auditor pursuant to section 105.145. This addendum must include an accounting of the political subdivision's annual general operating revenue, "total revenues from fines, bond forfeitures, and court costs for minor traffic violations occurring within the county, city, town, or village, including amended charges from any minor traffic violations," and a calculation of the percent of the annual general operating revenue that the fines, bond forfeitures, and court costs for minor traffic violations represent. Sec. 479.359.3(1)-(3). Finally, "a representative with knowledge of the subject matter as to the accuracy of the addendum contents" must certify its accuracy and sign "under the penalty of perjury, and witnessed by a notary public." Sec. 479.359.3(4).

SB 5 also enacted section 67.287, which lists "minimum standards" for certain municipalities. The statute defines such a "[m]unicipality" as "any city, town, or village located in any county with a charter form of government and with more than nine hundred fifty thousand inhabitants."

---

**2.** This Court has exclusive appellate jurisdiction pursuant to article V, section 3 of the Missouri Constitution as it involves the validity of a state statute.

Sec. 67.287.1(2). Section 67.287, in relevant part, requires covered municipalities to have "[a] police department accredited or certified by the Commission on Accreditation for Law Enforcement Agencies or the Missouri Police Chiefs Association or a contract for police service with a police department accredited or certified by such entities" within six years.

After the enactment of SB 5, twelve municipalities in St. Louis County[3] and two taxpayers filed a petition in the Cole County Circuit Court seeking a declaratory judgment and preliminary and permanent injunction. They alleged the new statutes created by SB 5 violate the Missouri Constitution's: (1) special law prohibition in article III, section 40(30); (2) restrictions on unfunded mandates in violation of article X, sections 16 and 21; (3) guarantee of separation of powers in article II, section 1; (4) prohibition on amending Supreme Court Rules without specifying which rules are being amended or limiting the amendments to a single bill as provided in article V, section 5; and (5) limit on the amount of fines a municipality can keep from minor traffic accidents in violation of article V, section 27(16).

In the trial court, Plaintiffs offered the testimony of two witnesses. Plaintiffs also introduced an affidavit from the certified public accountant who prepares the annual financial reports for both Normandy and Pagedale. The State conceded it did not offer any evidence, let alone any evidence to support a substantial justification. The trial court entered a judgment declaring (1) section 67.287's provision of minimum standards for certain municipalities, in its entirety, and section 479.359.2, insofar as it creates a lower cap applicable to only municipalities in counties with a charter form

of government and more than 950,000 inhabitants, are unconstitutional special laws and (2) the requirement in sections 67.287 and 479.359.3 that annual financial reports include an addendum certified under oath and penalty of perjury are unconstitutional unfunded mandates. The trial court also entered a permanent injunction enjoining the State from enforcing the provisions declared unconstitutional. Finally, the trial court dismissed Plaintiffs' other constitutional claims for failure to state a claim.

The State appeals the trial court's judgment declaring that SB 5 contained special laws and unfunded mandates and permanently enjoining the enforcement of those provisions. Plaintiffs appeal the trial court's dismissal of their other claims.

## Standard of Review

Challenges to a statute's constitutional validity are questions of law, which this Court reviews *de novo. Earth Island Inst. v. Union Elec. Co.*, 456 S.W.3d 27, 32 (Mo. banc 2015). Similarly, a trial court's grant of a motion to dismiss is reviewed *de novo. Conway v. CitiMortgage*, Inc., 438 S.W.3d 410, 413 (Mo. banc 2014). A judgment awarding equitable relief "will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *St. Louis Police Officers' Ass'n v. Bd. of Police Comm'rs of City of St. Louis*, 259 S.W.3d 526, 528 (Mo. banc 2008).

## Analysis

### I. SB 5 Contains Special Laws in Violation of the State Constitution

Missouri's first constitution in 1820 did not contain a prohibition against spe-

---

**3.** The municipality-plaintiffs are Normandy, Cool Valley, Velda Village Hills, Glen Echo Park, Bel Ridge, Bel-Nor, Pagedale, Moline Acres, Uplands Park, Vinta Park, Northwoods, and Wellston.

cial laws. *Washington Univ. v. Baumann*, 341 Mo. 708, 108 S.W.2d 403, 404 (1937). And prior to 1859, 87 percent of all legislation passed by the General Assembly was special legislation. *Jefferson Cnty. Fire Prot. Dists. Ass'n v. Blunt*, 205 S.W.3d 866, 868 (Mo. banc 2006). Since 1865, however, the Missouri Constitution has prohibited special laws. *See* Mo. CONST. of 1865, art. IV, sec. 27; Mo. CONST. of 1875, art. IV, sec. 53; Mo. CONST. of 1945, art. III, sec. 40(30). Currently, article III, section 40(30) of the Missouri Constitution provides that "[t]he general assembly shall not pass any local or special law ... where a general law can be made applicable, and whether a general law could have been made applicable is a judicial question to be judicially determined without regard to any legislative assertion on that subject."

The test employed to determine if a statute is a special law is whether the statute's applicability is based on open-ended or closed-ended characteristics. *City of DeSoto*, 476 S.W.3d at 287. A law based on closed-ended characteristics—e.g., historical facts, geography, or constitutional status—is facially special and presumed to be unconstitutional as others cannot come into the group nor can its members leave the group. *Id.* A law based on open-ended characteristics—e.g., population—on the other hand, is presumed to be constitutional. *Id.* "This 'open-endedness' allows the legislature to address the unique problems of size with focused legislation; it also permits those political subdivisions whose growth or decline brings them into a new classification the advantage of the legislature's previous consideration of the issues facing similarly situated governmental entities." *Sch. Dist. of Riverview Gardens v. St. Louis Cnty.*, 816 S.W.2d 219, 222 (Mo. banc 1991).

Typically, population-based classifications are considered open-ended as oth-

ers may fall into the classification and some current members may leave it. *City of DeSoto*, 476 S.W.3d at 287; *see, e.g., State ex rel. Fire Dist. of Lemay v. Smith*, 353 Mo. 807, 184 S.W.2d 593, 595 (Mo. banc 1945) (holding that a statute applying only to counties with 200,000 to 400,000 inhabitants was not a special law, despite only applying to St. Louis County at the time, because the act would apply to other counties that attain such a population in the future); *Hull v. Baumann*, 345 Mo. 159, 131 S.W.2d 721, 723 (1939) ("The classification of counties or cities according to population so that other counties and cities may come within the terms of the law in the future does not make the act a special law in violation of our Constitution, although such act applies only to one county or one city in the state at the time of its enactment because the population thereof is the only one within the limits fixed by the act at the time of its passage."); *State ex rel. Hollaway v. Knight*, 323 Mo. 1241, 21 S.W.2d 767, 768 (Mo. banc 1929) (holding that a statute applying only to counties with more than 300,000 and less than 600,000 inhabitants was not a special law because "[t]he classification of counties or cities according to population, so that other counties and cities may come within the terms of the law in the future, does not make the act a special law").

Some population-based statutory classifications may nonetheless be considered special laws if the presumption of their constitutional validity is overcome. The rationale for holding that population classifications are open-ended is defeated when the classification is so narrow that "as a practical matter others could not fall into that classification." 205 S.W.3d at 870. In *Jefferson County*, a population-based classification applying to counties with more than 198,000 but fewer than 199,200 inhabitants was held to be a special law

because it applied only to Jefferson County. *Id.* at 871. *Jefferson County* outlined a three-prong test to determine when the presumption of the constitutional validity of a population-based classification is overcome:

> (1) a statute contains a population classification that includes only one political subdivision, (2) other political subdivisions are similar in size to the targeted political subdivision, yet are not included, and (3) the population range is so narrow that the only apparent reason for the narrow range is to target a particular political subdivision and to exclude all others. If all three circumstances exist, the law is no longer presumed to be general, but is presumed to be a special law, requiring those defending it to show substantial justification for the classification.

*Id.* at 870-71. When a statutory population classification is so narrow, to consider it open-ended "would contravene the purpose behind the constitutional prohibition against special legislation." *Id.* at 870.

### A. SB 5 satisfies the Jefferson County three-prong test

### 1. St. Louis County is the only political subdivision to meet the classification in the challenged sections of SB 5

The State agrees the population-based classification and the charter form of government requirement in sections 67.287 (requiring minimum standards for certain municipalities) and 479.359.2 (imposing a lower revenue cap for certain municipalities) meet the first prong of the *Jefferson County* test as the classifications only apply to one political subdivision. According to the 2010 census of the United States,[4] only one county in Missouri has more than 950,000 inhabitants: St. Louis County with 998,954 people.[5] St. Louis County also has a charter form of government.

### 2. Other municipalities similar in size to those within St. Louis County are excluded from SB 5

Although the applicability of the next two prongs of the *Jefferson County* test are contested by the State, they are satisfied under the facts of this case. The State argues the second prong is not met because no county is similar in size to St. Louis County and is excluded from coverage. The most populous counties after St. Louis County, according to the 2010 census, are Jackson County with 674,158 inhabitants[6] and St. Charles County with 360,485 inhabitants.[7] All remaining counties have fewer than 300,000 inhabitants.[8]

This argument ignores the fact that the challenged statutes in SB 5 target not only St. Louis County but also the municipalities within it. Because of the special law provisions in SB 5, the 90 municipalities in St. Louis County are the only municipalities in the state that are required to enact minimum standards (section 67.287) and a lower cap on fines, bond forfeitures, and court costs (section 479.359.2). Populations of municipalities within St. Louis County range from 52,158 (the city of Florissant)

---

4. The ascertainment of a political subdivision's population is determined by the most recent decennial national census. Sec. 1.100.1, RSMo 2000.

5. U.S. CENSUS BUREAU, MISSOURI: 2010, POPULATION AND HOUSING UNIT COUNTS 9 (2012).

6. *Id.* at 8.

7. *Id.* at 9.

8. *Id.* at 90. The City of St. Louis, which is an independent city not within a county, has 319,294 inhabitants according to the 2010 census. *Id.* at 9.

to 13 (the village of Champ),[9] yet there are hundreds of municipalities throughout the state with populations falling within that same range that are not required to establish minimum standards or be subject to the separate lower cap on fines, bond forfeitures, and court costs. Because those municipalities, which are similar in size to those in St. Louis County, are not subject to the special law provisions in SB 5, the second prong of the *Jefferson County* test is satisfied.

### 3. The only apparent reason for the challenged classifications in SB 5 was to target St. Louis County

The third prong of the Jefferson County test was recently clarified in *City of DeSoto*. The statute at issue in *City of DeSoto* excluded from its coverage any city that met all of the following six criteria:

(1) operate[s] a city fire department, (2) [is] a third-class city, (3) [has] more than 6,000 but fewer than 7,000 inhabitants, (4) [is] located in any county with a charter form of government with (5) more than 200,000 but fewer than 350,000 inhabitants, and (6) [is] entirely surrounded by a single fire protection district.

476 S.W.3d at 288. *City of DeSoto* rejected the State's argument that the Court should look at each criterion individually, "asking itself whether any other city someday *might* meet any particular criterion." *Id.* Because the statute required a city to meet all six criteria to be excluded from coverage, the Court considered "[t]he com-

*bined effect* of the six criteria." *Id.* at 288-89 (emphasis added).

To begin, De Soto was the only city that fell into the third-class city population window. *Id.* at 289. Both parties agreed Jefferson County was the only county that fell within the 200,000 to 350,000 county population range set out in the statute. *Id.* Neither party identified any other county that, "*as a practical matter*, is *likely* to fall within the range of 200,000 to 350,000 *in the foreseeable future.*" *Id.* (emphasis added). The other four criteria solidified the Court's decision that the statute was a special law because

[t]he likelihood of all of these factors converging and of another city coming within the scope of [the statute] is sufficiently unlikely that, in the words of *Jefferson County*, "the only apparent reason for the narrow range is to target a particular political subdivision and to exclude all the others."

*Id.* at 290 (quoting *Jefferson Cnty.*, 205 S.W.3d at 871).

While the statutes in this case do not involve as many criteria as the statute at issue in *City of DeSoto*, sections 67.287 and 479.359.2 nonetheless include two criteria: counties with a charter form of government and with more than 950,000 inhabitants.[10] The criteria in SB 5 *currently* apply only to St. Louis County, and as a practical matter, it would be highly unlikely that both criteria would converge in the foreseeable future such that another county would come within the scope of the statutes.[11]

---

9. *Id.* at 50, 90-92.

10. The dissent's reliance on pre-*Jefferson County* cases, such as *Treadway v. State*, 988 S.W.2d 508, 511 (Mo. banc 1999), *Riverview Gardens*, 816 S.W.2d at 222, and *Walters v. City of St. Louis*, 364 Mo. 56, 259 S.W.2d 377, 383 (Mo. banc 1953), is misplaced. Op. at 203-04.

11. The State noted that Plaintiffs conceded in their pleadings that Jackson County, also a county with a charter form of government, "will likely reach 950,000 eventually." Although no evidence was presented, Plaintiff's actual claim was that, at its current population growth rate, Jackson County will not reach SB 5's population threshold for 150 years.

Further, quoting the language of *City of DeSoto*, "as a practical matter," St. Louis County is not "likely" to leave the statutory classification by its population falling below 950,000 inhabitants in the "foreseeable future." *See* 476 S.W.3d at 289. Although *City of DeSoto* does not define "foreseeable," it is defined as "being such as may reasonably be anticipated" or "lying within the range for which forecasts are possible." WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 890 (unabridged 1993). No evidence was offered in the trial court that it could be "reasonably anticipated" or "lying within the range for which forecasts are possible" that, as a practical matter, St. Louis County is likely to fall below the 950,000 population level by losing 5 percent of its population from the 2010 census figure by falling below 950,000 inhabitants in the foreseeable future. Neither was evidence offered that it could be "reasonably anticipated" or "lying within the range for which forecasts are possible" that, as a practical matter, any other county in the state is likely to increase in population to cross SB 5's 950,000-inhabitant threshold in the foreseeable future.

Over the past 100 years, St. Louis County's population has increased every census except in 2010, when its population dropped 1.7 percent from 1,016,300 in 2000 to 998,954.[12] Data from the United States Census Bureau demonstrates that St. Louis County's less than two-percent drop in population in 2010 is not indicative of a trend of decreasing population. As shown in the table below, St. Louis County has shown steady growth since it first reached a population of 950,000 in 1970.[13]

| Census Year | St. Louis County's Population |
| --- | --- |
| 1970 | 951,671 |
| 1980 | 974,180 |
| 1990 | 993,508 |
| 2000 | 1,016,300 |
| 2010 | 998,954 |

The United States Census Bureau further estimates St. Louis County's population in 2016 to be 998,581.[14] While its population is estimated to have dropped since 2010, this

12. U.S. CENSUS BUREAU, MISSOURI: 2010, POPULATION AND HOUSING UNIT COUNTS 7 (2012).

13. *Id.* at 7.

14. *St. Louis County, Missouri*, U.S. CENSUS BUREAU, http://www.census.gov/quickfacts/table/PST045215/29189 (last visited May 15, 2017).

estimated 0.04-percent decrease over seven years is not enough to persuade this Court that St. Louis County, "as a practical matter," is "likely" to fall below SB 5's population threshold in the "foreseeable future." *See City of DeSoto*, 476 S.W.3d at 289.

Because the General Assembly is presumed to not have enacted meaningless provisions, *Bachtel v. Miller Cnty. Nursing Home Dist.*, 110 S.W.3d 799, 805 (Mo. banc 2003), this Court can safely presume the General Assembly knew when it passed SB 5 in 2015 that St. Louis County was the only charter county with a population more than 950,000 and because it has been the only county to meet the criteria since 1970.

The State also contends St. Louis County voters could choose to opt out of both sections 67.287 and 479.359.2 by replacing their charter form of government. St. Louis County voters, however, adopted a charter form of government in 1950, and there was no evidence voters will decide to change their form of government in the foreseeable future.[15] The second prong of *Jefferson County* is satisfied.

■■■ The State further argues the population classifications in sections 67.287 and 479.359.2 fail the third prong of *Jefferson County*'s special law test because there is no upper limit on the population classifications, and, as a result, the population classifications cannot be considered *narrow*. While the State is correct that this is an important distinction from prior cases, it is not dispositive here. There need not necessarily be a threshold coupled with

a ceiling in a statutory population classification such that it creates a relatively small window into which a political subdivision must fit for a statute to be an unconstitutional special law. Like the statutes here, it is sufficient that the population classification is sufficiently high or low that it applies to only one political subdivision currently and will only apply to one political subdivision for the foreseeable future. In such a case, the same reasoning set out in *City of DeSoto* and in *Jefferson County* applies if one substitutes the words "population minimum" for the words "narrow range": "the only apparent reason for the [population minimum] is to target a particular political subdivision and to exclude all others." *See Jefferson Cnty.*, 205 S.W.3d at 871. Because the challenged sections of SB 5 clearly targeted St. Louis County and excluded all other political subdivisions, both sections 67.287 and 479.359.2 fall within the reasoning set out in the third prong of *Jefferson County*.

### 4. The analysis of this opinion shall apply prospectively

As all three prongs of *Jefferson County* are satisfied here, the presumption of constitutional validity of sections 67.287 and 479.359.2, insofar as it creates a separate cap on counties with a charter form of government and more than 950,000 inhabitants, is overcome and the statutes are presumed special laws. *See Jefferson Cnty.*, 205 S.W.3d at 871. *Jefferson County* applied its holding prospectively, as it was the first case to articulate that a narrow population range in a statute could be considered a special law.[16] While this is the

---

15. The State also argued a county's population can change by adjusting the county boundaries by statute. For example, Jackson County and Clay County could decide to merge and bring their combined population closer to the requirement in SB 5. That argument fails to account for this Court's ruling in *City of DeSoto*, which looks to what, "*as a practical matter*, is *likely*" to happen in "the *foreseeable* future" and not merely a "possible" outcome. 476 S.W.3d at 289 (emphasis added).

16. "Because of the General Assembly's possible reliance on previous cases not articulating

first case to modify the *Jefferson County* analysis to apply to statutes setting a population minimum or maximum rather than a narrow population range, it is a logical extension of the reasoning in *Jefferson County*. The analysis in this opinion shall also apply prospectively to statutes passed after the date of this opinion because of the General Assembly's possible reliance on previous cases not addressing challenges to statutes with a population minimum or maximum.[17]

### B. The State offered no evidence of a substantial justification for the special law provisions of SB 5

When, as here, a challenged statute is presumed a special law, the State must show substantial justification for the special treatment. *Id.* This burden shifting was first established in 1993 in *O'Reilly v. City of Hazelwood*, 850 S.W.2d 96, 99 (Mo. banc 1993). *O'Reilly*, in analyzing the meaning of article III, section 40(30), found this provision does not bar special legislation; rather, it "requires the judiciary to determine whether a general law could have been made applicable 'without regard to any legislative assertion on

that subject.'" 850 S.W.2d at 99 (quoting Mo. CONST. art. III, sec. 40(30)).

A special law can certainly survive constitutional infirmity if the State offers evidence of a substantial justification. In fact, since *O'Reilly*, this Court has upheld special laws when the party defending them presented evidence of substantial justification for the special treatment.[18] For example, in *Board of Education of the City of St. Louis v. Missouri State Board of Education*, 271 S.W.3d 1 (Mo. banc 2008), the State established substantial justification for a facially special law by showing the law was passed to address "the long history of state-mandated, segregated schools ... the complexity of the issues, and the difficulty of developing a plan that will ensure that students of all races will have a continuing equal opportunity for a quality, integrated education." *Id.* at 10 (quoting *Liddell by Liddell v. Bd. of Educ. of City of St. Louis*, 126 F.3d 1049, 1056 (8th Cir. 1997)). *See also City of Sullivan v. Sites*, 329 S.W.3d 691, 694 (Mo. banc 2010) (holding that the city had presented evidence of substantial justification for a sewer fee based on a particular loca-

---

this presumption, only statutes passed after the date of this opinion are subject to this analysis." *Jefferson Cnty.*, 205 S.W.3d at 871.

17. Similarly, this Court construes statutory language in accordance with prior decisions because "[t]he General Assembly is presumed to rely on this Court's prior decisions interpreting statutes." *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 387-88 (Mo. banc 2014).

18. Whether a statute is presumed general or special determines the standard used when judging its constitutional validity. *City of St. Louis v. State*, 382 S.W.3d 905, 915 (Mo. banc 2012). If a statute is held to be a general law, courts use the rational-basis test and the burden is on the party contesting the statute's constitutional validity to show the statutory classification is arbitrary and lacks a rational relationship to a legitimate legislative pur-

pose. *Id.* (quoting *Jefferson Cnty.*, 205 S.W.3d at 870); *O'Reilly*, 850 S.W.2d at 99. If a statute is held to be a special law, however, the party defending the statute must demonstrate a substantial justification for the special treatment. *City of St. Louis*, 382 S.W.3d at 915 (quoting *Jefferson Cnty.*, 205 S.W.3d at 870). This distinction was made clear in *O'Reilly*: the statute at issue was not open-ended, and, as a result, the Court concluded "the respondents *must do more*: they must demonstrate a substantial justification to exclude other counties." 850 S.W.2d at 99 (emphasis added); *City of Springfield v. Sprint Spectrum, L.P.*, 203 S.W.3d 177, 186 (Mo. banc 2006) ("In order to meet this [substantial justification] standard, the mere existence of a rational or reasonable basis for the classification is insufficient").

tion because certain areas had benefited from previous sewer improvements).

The State concedes it did not present any evidence of substantial justification in the trial court because it believed the statutes did not meet the *Jefferson County* presumption of special laws test. By presenting no evidence of substantial justification for the presumed special laws, the State failed to overcome the presumption of constitutional invalidity.

Of course, special laws like this may be passed by the General Assembly in the future and can survive a special law challenge as long as evidence of substantial justification is offered in the trial court. Because the State failed to present evidence of a substantial justification for the special treatment, portions of SB 5 passed in 2015 violate the Missouri Constitution. This Court cannot ignore article III, section 40(30)'s prohibition against special laws.

> It is the duty of this Court to be faithful to the constitution. "[I]t cannot ascribe to it a meaning that is contrary to that clearly intended by the drafters. Rather, a court must undertake to ascribe to the words of a constitutional provision the meaning that the people understood them to have when the provision was adopted."

*Id.* at 872 (quoting *Farmer v. Kinder*, 89 S.W.3d 447, 452 (Mo. banc 2002)).

■■■ *City of DeSoto* made clear that "the legislature may not defeat the purpose of the prohibition against special laws by adopting a provision that on its face appears general and open-ended, but which realistically applies only to a specific or narrow group of subjects." *Id.* at 287. As the population classifications in sections 67.287 and 479.359.2 will only apply to St. Louis County for the foreseeable future and the State failed to provide evidence in the trial court to demonstrate substantial justification for the special treatment, this Court holds that both statutes are unconstitutional special laws. The trial court's permanent injunction enjoining the State from enforcing these specific sections is affirmed.

■■■ Pursuant to this Court's authority under section 1.140, RSMo 2000, section 479.359.2, insofar as it provides "except that any county with a charter form of government and with more than nine hundred fifty thousand inhabitants and any city, town, or village with boundaries found within such county shall be reduced from thirty percent to twelve and one-half percent," is severed from the rest of section 479.359.2, resulting in a 20-percent cap on fines, bond forfeitures, and court costs applying statewide.[19]

---

19. Once a portion of a statute is deemed unconstitutional, "courts are to presume that the legislature intended to give effect to the other parts of the statute that are not invalidated." *Dodson v. Ferrara*, 491 S.W.3d 542, 558 (Mo. banc 2016). Section 1.140, RSMo 2000, provides:

> The provisions of every statute are severable. If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Courts will uphold valid portions of a statute despite the inclusion of invalid portions when: "(1) after separating the invalid portions, the remaining portions are in all respects complete and susceptible of constitutional enforcement; and (2) the remaining statute is one that the legislature would have enacted if it had known that the rescinded portion was

## II. Plaintiffs' Unfunded Mandate Claims Are Not Ripe

The State also appeals the trial court's judgment that SB 5, as codified in sections 67.287 and 479.359.3, included unfunded mandates for the cities of Normandy and Pagedale[20] by requiring political subdivisions, among other things, to obtain professional accreditation for police departments (section 67.287.2(6)) and submit an addendum to their annual financial reports to the state auditor (section 479.359.3) without also allocating funds to those political subdivisions.

The Hancock Amendment to the Missouri Constitution prohibits the General Assembly "from requiring any new or expanded activities by counties and other political subdivisions without full state financing." Mo. CONST. art. X, sec. 16. It also provides that the General Assembly shall not impose a new activity or service on a political subdivision or increase a political subdivision's level of activity or service "unless a state appropriation is made and disbursed to pay the county or other political subdivision for any increased costs." Id. sec. 21.

There is a two-prong test for determining whether a statute is an unconstitutional unfunded mandate. "The first prong ... is established when the State requires local entities to begin a new mandated activity or to increase the level of an existing activity beyond the level required on November 4, 1980." Breitenfeld v. Sch. Dist. of Clayton, 399 S.W.3d 816, 826 (Mo. banc 2013). The second prong is satisfied when "the State provides insufficient funding to offset the full costs of compliance" and political subdivisions experience increased costs in performing the new activity or service. Id. at 827. A Hancock Amendment challenge "is not ripe without specific proof of new or increased duties and increased expenses, and these elements cannot be established by mere 'common sense,' or 'speculation and conjecture.'" Brooks v. State, 128 S.W.3d 844, 849 (Mo. banc 2004) (emphasis added). The second prong further requires proof that political subdivisions have actually experienced an increase in costs.

Here, the evidence presented concerned speculative costs of complying with some of the mandates of SB 5. Of all of the new statutory obligations required by section 67.287.2, Plaintiffs offered evidence in regard to only section 67.287.2(6), municipal police department accreditation. Their sole evidence was testimony from a former municipal police chief about the potential cost of obtaining and maintaining accreditation for Pagedale's police department.[21] Despite

invalid." Dodson, 491 S.W.3d at 558. This Court concludes the valid provisions of section 479.359.2 that reduced the 30-percent cap to 20 percent were not essential to, inseparably connected with, or so dependent upon the separate 12.5-percent cap that applied only to St. Louis County. See sec. 1.140; Riverview Gardens, 816 S.W.2d at 223. It can be presumed that the General Assembly would have enacted the 20-percent without the 12.5-percent cap. Therefore, severance is appropriate.

20. In Plaintiffs' petition, Counts III and IV specified that only the taxpayer plaintiffs, who reside in Normandy and Pagedale, were bringing the Hancock Amendment challenges. King–Willmann v. Webster Groves Sch. Dist., 361 S.W.3d 414, 416-17 (Mo. banc 2012) (noting taxpayers have standing to bring a Hancock Amendment challenge against a statute, not government entities).

21. Mayor Patrick Green of Normandy testified his city's police department already meets this accreditation requirement. Former Hazelwood Police Chief Carl Wolf testified that obtaining accreditation could take three years and police departments may need to make changes to meet the accreditation criteria. He further estimated it would cost Pagedale $8,700 to apply for the required ac-

the potential increased cost to municipalities, the requirement does not become a mandate until August 28, 2021.[22] Plaintiffs could not establish the General Assembly would not fund any increased costs the municipalities would incur in accrediting their police departments. Because the General Assembly has several years to appropriate sufficient funding to political subdivisions for this potential cost, the Hancock Amendment claims are not ripe.

Plaintiffs' other Hancock Amendment claim concerned the amended Macks Creek Law, section 479.359.3, which requires an addendum be submitted with the annual financial report to the state auditor detailing (1) the political subdivision's annual general operating revenue; (2) the total revenue collected from fines, bond forfeitures, and minor traffic violation court costs; and (3) the percent of the annual general operating revenue derived from fines, bond forfeitures, and minor traffic violation court costs.

Many of the requirements of section 479.359.3 are found in the previous version of the Macks Creek Law, such as requiring political subdivisions to include an accounting of the percentage of their annual general operating revenue from fines and court costs. Sec. 302.341.2. The only *new* activity Plaintiffs challenged is the obligation to attach an addendum to their annual financial reports showing the figures used in calculating the percent of their annual general operating revenue derived from fines, bond forfeitures, and

court costs for minor traffic violations.[23] The cost of including an additional piece of paper to an annual financial report is *de minimis*.

Plaintiffs argue the new requirement under section 479.359.3(4) requiring the addendum be "certified and signed by a representative with knowledge of the subject matter as to the accuracy of the addendum contents, under oath and under the penalty of perjury, and witnessed by a notary public" is more than *de minimis* because of the potential criminal implications. Plaintiffs offered evidence of only the cost of *calculating* the annual general operating revenue and court costs, which was not challenged. There was no evidence presented about any additional cost—either financial or time spent—needed for a municipality to certify and sign an accurate addendum. Although the State concedes that, under SB 5, municipalities are required to calculate more items than under the previous law, this increased duty is *de minimis*.

The trial court's judgment declaring that sections 67.287 and 479.359.3 violate the Hancock Amendment is reversed, and the claims are dismissed.

### III. SB 5 Does Not Violate the Separation of Powers Doctrine

 Plaintiffs' cross-appeal challenges the trial court's dismissal of Counts V, VI, VII, and VIII in their petition.[24] In Counts

---

creditation and $3,700 annually to maintain accreditation.

**22.** Pursuant to SB 5, municipalities have six years to meet the police accreditation requirement. Sec. 67.287.2.

**23.** Plaintiffs presented an affidavit from Angela Dorn, the certified public accountant who prepares the annual financial reports for both Normandy and Pagedale. She indicated it

would cost each city approximately $300 to $500 to calculate the percentages of their annual general operating revenue from fines and court costs. Mayor Green of Normandy, however, testified the annual calculations were currently being performed and had been performed prior to the enactment of SB 5.

**24.** Plaintiffs did not appeal the trial court's dismissal of Count IX alleging SB 5 violated

V and VI, Plaintiffs assert sections 479.359, 479.360, and 479.362 violate the separation of powers doctrine as guaranteed by article II, section 1 of the Missouri Constitution because they grant the director of revenue authority to supervise the judicial branch of government as well as assume the powers entrusted to the judicial branch.

 Article II, section 1 of the constitution provides for the separation of powers among the legislative, executive, and judicial branches of state government and prohibits one branch from exercising powers belonging to another. Plaintiffs assert provisions in SB 5 shift this Court's inherent authority to supervise municipal courts as found in article V, section 4 of the Missouri Constitution to the director of revenue.

Section 479.359.3 requires political subdivisions to submit an addendum to the state auditor with their annual financial reports showing the figures used in calculating the percent of their annual general operating revenue derived from fines, bond forfeitures, and court costs for minor traffic violations. Section 479.360 requires municipalities to certify their substantial compliance with certain procedures in the handling of cases by filing another addendum with the state auditor. If a political subdivision fails to file the addendums as required by section 479.359.3 or section 479.360 or send any excess revenue to the director of revenue, section 479.362.5 provides that the director of revenue shall send a final notice to the clerk of the municipal court. The municipality then has five days to comply with the statutory requirements, after which

> *the director of the department of revenue shall send a notice of the noncompliance* to the presiding judge of the circuit court in which any county, city, town, or village is located *and the presiding judge of the circuit court shall immediately order the clerk of the municipal court to certify all pending matters in the municipal court* until such county, city, town, or village files an accurate addendum and sends excess revenue to the director of the department of revenue.

*Id.* (emphasis added).[25]

Plaintiffs mischaracterize the provisions of SB 5 as giving the director of revenue "supervisory authority" over municipal courts. Rather, section 479.362.5 creates a ministerial duty for the director of revenue to send a notice of noncompliance to the presiding judge of the circuit court.[26] It is the presiding judge, not the director of revenue, who orders the clerk of the noncomplying municipal court to certify all pending matters.[27]

---

the single-subject rule under article III, section 23 of the Missouri Constitution.

**25.** The word "certify" as used in the statute means the municipal court clerk must assign all pending matters to the circuit court in which it resides. *Cf.* sec. 479.150, RSMo Supp. 2013.

**26.** Plaintiffs argue the director of revenue's duty is discretionary rather than ministerial. They contend the director exercises discretion when he or she determines a political subdivision fails to file or files an inaccurate addendum and, therefore, violates the separation of powers doctrine. The State, however, correctly points out that whether a political subdivision timely filed a document is a simple yes or no question without regard to any exercise of judgment. Further, the director makes a determination of the accuracy of an addendum based on the numbers calculated *by the political subdivision.* Neither function relies on the discretion of the director of revenue.

**27.** Similarly, the director of revenue is required to *notify* this Court when a member of the bar has failed to pay taxes. Sec. 484.053, RSMo Supp. 2013.

The trial court did not err in dismissing Plaintiffs' Counts V and VI separation of powers claims.

### IV. Section 479.360 in SB 5 Does Not Amend Court Rules

In Count VII of the petition, Plaintiffs alleged section 479.360.1 in SB 5 purports to amend provisions of Supreme Court of Missouri Rule 37 without expressly referring to or identifying the rule it purports to amend. Plaintiffs contend section 479.360.1, by failing to identify the rule it purports to amend and by failing to limit its purpose of amending, violates article V, section 5 of the Missouri Constitution.

The Missouri Constitution gives this Court the power to "establish rules relating to practice, procedure and pleading for all courts and administrative tribunals, which shall have the force and effect of law." Mo. CONST. art. V, sec. 5. However, "[a]ny rule may be annulled or amended in whole or in part *by a law limited to the purpose.*" *Id.* (emphasis added). For a statute to qualify as one "limited to the purpose" of annulling or amending a rule, it " 'must refer expressly to the rule' and be limited to the purpose of amending or annulling it." *State ex rel. Collector of Winchester v. Jamison*, 357 S.W.3d 589, 592 (Mo. banc 2012) (quoting *State ex rel. K.C. v. Gant*, 661 S.W.2d 483, 485 (Mo. banc 1983)).

Plaintiffs argue section 479.360.1(1) as enacted by SB 5 impermissibly amends Rule 37.47(a). Rule 37.47(a), provides, "A person arrested under a warrant for an ordinance violation who does not satisfy conditions for release shall be brought *as soon as practicable* before a judge of the court from which the warrant was issued." (Emphasis added). Section 479.360.1(1) mandates:

Defendants in custody pursuant to an initial arrest warrant issued by a municipal court have an opportunity to be heard by a judge in person, by telephone, or video conferencing *as soon as practicable and not later than forty-eight hours on minor traffic violations and not later than seventy-two hours on other violations* and, if not given that opportunity, are released[.]

(Emphasis added).

If section 479.360.1 amended or annulled any existing Supreme Court Rules, then article V, section 5 would require the specific rule to be identified. But Plaintiffs fail to demonstrate any inconsistencies between the procedures required by section 479.360.1 and any rules. The new requirement does not conflict with Rule 37 because municipalities can comply with both the rule and the statute. Municipalities must still comport with Rule 37.47(a)'s obligation to bring defendants before a judge as soon as practicable, but they now have a time limit by which to do so: either 48 or 72 hours, depending on the violation.

Plaintiffs also allege section 479.360.1(2), which prohibits defendants from being held in municipal custody for more than 24 hours without a warrant, is inconsistent with Rules 37.17, 37.18, and 37.19 because the rules contain no time limit. Section 479.360.1(2) does not conflict with existing Supreme Court Rules for the same reason section 479.360.1(1) does not conflict with existing Supreme Court Rules: additional deadlines are not in conflict when existing rules do not contain time limits.

The challenged provisions of section 479.360 in SB 5 are additional, *not contradictory*, procedural protections. Because SB 5 did not amend or annul any parts of Rule 37, the statute was not required to expressly identify the specific rule to be amended or to be limited to that purpose.

The trial court's dismissal of Count VII of Plaintiffs' claim that SB 5 violated article V, section 5 of the Missouri Constitution is affirmed.

### V. Section 479.362.5 in SB 5 Does Not Violate the Constitution by Limiting the Amount of Fines Municipalities Can Keep

■ Finally, Count VIII of Plaintiffs' petition challenged section 479.362.5, claiming it impermissibly limits a municipality's right to collect and retain fines. Section 479.362.5 provides that, if a municipality fails to comply with the reporting requirements in SB 5, cases in the municipal court are certified, and that "[a]ll fines, bond forfeitures, and court costs ordered or collected while [such municipality] has its municipal court matters reassigned under this subsection shall be paid to the director of the department of revenue."

Plaintiffs argue section 479.362.5's requirement that all municipal fines, imposed by the trial court while a municipality is out of compliance with provisions of SB 5, be remitted to the director of revenue is a violation of article V, section 27.16 of the Missouri Constitution. This constitutional section provides, "A municipal corporation with a population of under four hundred thousand ... shall receive and retain any fines to which it may be entitled." Mo. CONST. art. V, sec. 27.16.

■ The State, however, contends the amount of fines, if any, that a municipality is *entitled* to keep for ordinance violations is a function of statute, not the constitution. The constitution does not define the phrase "to which it may be entitled" but, in essence, leaves that to the General Assembly, which has plenary power to enact statutes on any subject not prohibited by the state's constitution. *Bd. of Educ. of City of St. Louis v. City of St. Louis*, 879 S.W.2d 530, 533 (Mo. banc 1994). While municipalities are entitled to impose and retain fines pursuant to article V, section 27.16 of the Missouri Constitution, that right is subject to statutory limitations as determined by the General Assembly. There is no conflict between the statute and constitutional provision here.

The trial court's dismissal of Plaintiffs' claim that section 479.362.5 in SB 5 violates article V, section 27(16) of the Missouri Constitution is affirmed.

### Conclusion

Special laws like this may be passed by the General Assembly in the future and can survive a special law challenge as long as evidence of substantial justification is offered in the trial court. Because the State failed to present any evidence of substantial justification for enacting either section 67.287, in its entirety, or section 479.359.2, insofar as it creates a separate cap on counties with a charter form of government and with more than 950,000 inhabitants, they are special laws. The statutes target municipalities in one political subdivision: St. Louis County. The trial court's judgment permanently enjoining the State from enforcing these provisions is, therefore, affirmed.

Section 479.359.2, insofar as it provides "except that any county with a charter form of government and with more than nine hundred fifty thousand inhabitants and any city, town, or village with boundaries found within such county shall be reduced from thirty percent to twelve and one-half percent," is severed from the rest of section 479.359.2. By severing this language, section 479.359.2 imposes a uniform cap on fines, bond forfeitures, and court costs of 20 percent statewide.

This Court reverses the trial court's judgment that sections 67.287 and 479.359.3 are Hancock violations as these

claims are not ripe for review because the General Assembly has until August 28, 2021, to appropriate funds, and the alleged increased duty is *de minimis*. The trial court's dismissal of the Plaintiffs' other constitutional claims is affirmed. In total, the trial court's judgment is affirmed in part and reversed in part.

Breckenridge, C.J., Stith and Draper, JJ., concur; Fischer, J., concurs in separate opinion filed; Hess, Sp.J., dissents in separate opinion filed. Wilson and Powell, JJ., not participating.

Zel M. Fischer, Judge, concurring.

The principal opinion holds its decision shall apply "prospectively to statutes passed after the date of this opinion because of the General Assembly's possible reliance on previous cases not addressing challenges to statutes with a population minimum or maximum." Op. at 196. The principal opinion calls its application of the third prong of *Jefferson County*[1] to new facts a "logical extension of the reasoning in *Jefferson County*" warranting only prospective application. *Id.* It is true the population-based classification at issue in *Jefferson County* involved a "narrow population range" and not a "population minimum or maximum" like the present case. But this is a distinction without a difference for purposes of prospective application. In either case the pertinent question is whether "the classification is so narrow that as a practical matter others could not fall into that classification." *Jefferson Cnty.*, 205 S.W.3d at 870. "When a nominally open-ended law meets the[ ] [*Jefferson County*] criteria it will be considered a special law because, as a practical matter, no other political subdivision can meet th[e] criteria." *City of DeSoto v.*

*Nixon*, 476 S.W.3d 282, 287 (Mo. banc 2016).

What the principal opinion calls a "logical extension of the reasoning in *Jefferson County*," in my view, is merely an application of settled law to a new set of facts. The principal opinion does not announce a new rule of constitutional law or a new analysis; it merely declares what the law is and that the special laws provision of the Missouri Constitution has been violated. There is no justification for the decision to only apply prospectively. Indeed,

> [a]n unconstitutional statute is no law and confers no rights. This is true from the date of its enactment, and not merely from the date of the decision so branding it. **Solely prospective application of a decision is the exception not the norm because it involves judicial enforcement of a statute after the statute has been found to violate the Constitution and to be void and without effect *ab initio*[.]**

*Trout v. State*, 231 S.W.3d 140, 148 (Mo. banc 2007) (per curiam) (emphasis added) (internal quotation and citation omitted).

Following *Jefferson County*, statutes containing a population-based classification with the practical effect of singling out a political subdivision, including statutes aimed at St. Louis County, are inherently suspect and those defending such statutes must show a "substantial justification for the classification" to pass constitutional muster. *Jefferson Cnty.*, 205 S.W.3d at 871. For that reason, statutes passed after *Jefferson County* should not be immune from a constitutional challenge based on that analysis. The General Assembly was certainly on notice of this Court's analysis in

---

**1.** *Jefferson Cnty. Fire Prot. Dists. Ass'n v. Blunt,* 205 S.W.3d 866, 871 (Mo. banc 2006) (providing that "the population range is so narrow that the only apparent reason for the narrow range is to target a particular political subdivision and to exclude all others").

*Jefferson County*.[2] After all, "you don't need a weatherman to know which way the wind blows." Bob Dylan, *Subterranean Homesick Blues, on* Bringing It All Back Home (Columbia Records 1965).

Philip M. Hess, Special Judge, dissenting.

I concur with the principal opinion's holdings in all respects, except I respectfully dissent from the principal opinion's holding that SB 5 contains special laws in violation of the Missouri Constitution. Section 67.287.1(2)'s[1] definition of "[m]unicipality" as "any city, town, or village located in any county with a charter form of government and with more than nine hundred fifty thousand inhabitants" is sufficiently open-ended to avoid declaring SB 5's provisions special laws.

As noted in the principal opinion, this Court established a three-prong test to analyze population-based classifications in *Jefferson County Fire Protection Districts Ass'n v. Blunt*:

(1) a statute contains a population classification that includes only one political subdivision, (2) other political subdivisions are similar in size to the targeted political subdivision, yet are not included, and (3) the population range is so narrow that the only apparent reason for the narrow range is to target a particular political subdivision and to exclude all others. If all three circumstances exist, the law is no longer presumed to be general, but is presumed to be a special law, requiring those defending it to show

substantial justification for the classification.

205 S.W.3d 866, 870-71 (Mo. banc 2006).

In its brief, the State acknowledges St. Louis County is the only county that currently satisfies the population requirements of SB 5, although it asserts "other counties will move into (or out of) a particular population range as they expand (or contract)." I agree with the principal opinion that prong one of *Jefferson County* is met.

Prongs two and three are not met, in my opinion. Regarding prong two, there is no political subdivision of similar size to St. Louis County. It is, therefore, impossible to exclude a similarly sized political subdivision to St. Louis County from SB 5. Prong two is not met.

With regard to prong three, SB 5's population range is 950,000 residents as a floor, with no population ceiling at all. §§ 67.287.1(2), 479.359.2. Nine hundred and fifty thousand residents to an unlimited number is a very broad population range indeed. In contrast, the population range in *Jefferson County* was 198,000 residents to 199,200 residents. 205 S.W.3d at 867. Twelve hundred residents is a very narrow population range. Also in contrast, there were two concurrent population ranges in the *City of DeSoto v. Nixon*, 476 S.W.3d 282, 288 (Mo. banc 2016). There, the statute required both that a county have between 200,000 residents and 350,000 residents and that a city within the county have between 6,000 residents and 7,000 residents. *Id.* Again, 1,000 residents is a very narrow population range.

---

2. As the principal opinion appropriately explains, the dissenting opinion's reliance on pre-*Jefferson County* cases that did not strike down statutes that applied only to St. Louis County is misplaced. *Compare* Op. at 193 n.10, *with* Op. at 205 (Hess, S.J., dissenting).

1. All statutory citations are to RSMo Supp. 2015 unless otherwise indicated.

SB 5's county population range is 950,-000 residents to an unlimited number. Unlike in *DeSoto*, there is no further population range restriction for cities, towns or villages within the defined county. §§ 67.287.1(2), 479.359.2. SB 5's population range is clearly not "narrow." I would conclude the third prong of *Jefferson County* is not met.

Under the principal opinion's "foreseeability" analysis, it concludes SB 5's population classification is not only narrow but also the only apparent reason for SB 5's population minimum is to target a political subdivision and to exclude all others. While I agree an apparent reason for the population range in SB 5 is to target a particular political subdivision—St. Louis County—I disagree that the only apparent reason for the population classification is to *exclude* all other political subdivisions. The majority seems to hold that, because a statute currently applies to a single political subdivision, its purpose must necessarily be to exclude all other political subdivisions. No previous decision of this Court has so held with regard to broad population classifications that contain no further restriction. *See, e.g.*, *Treadway v. State*, 988 S.W.2d 508, 511 (Mo. banc 1999) ("The fact that currently the statute applies only to the St. Louis metropolitan region does not necessarily make the act a special law because the act can apply to other counties that attain the same statutory criteria in the future."); *Sch. Dist. of Riverview Gardens v. St. Louis Cnty.*, 816 S.W.2d 219, 222 (Mo. banc 1991) (explaining that "statutes establishing classifications based on population are general laws, even when it appears with reasonable certainty that no other political subdivision will come within that population classification during the effective life of the law"); *Walters v. City of St. Louis*, 364 Mo. 56, 259 S.W.2d 377, 383 (Mo. banc 1953) (explaining that, when analyzing whether a statute is a special law,

"[t]he conceded fact that it is a practical certainty no other city in this State will attain a population of more than 700,000 prior to the expiration date of the act, April 1, 1954, does not in the least affect the situation").

I prefer this Court's earlier precedent to the principal opinion's use of a "foreseeability" test to conclude the sole purpose of the population classification in SB 5 was to exclude all other political subdivisions. In my opinion, tying the constitutional validity of a law containing population classifications to uncertain and unknown future population trends does not give the General Assembly sufficient guidance on what it can and cannot constitutionally do.

Also, the principal opinion notes with approval the general rule that laws based on open-ended characteristics are presumed to be constitutional because some "*may* fall into the classification" in the future or some current members "*may* leave it." *DeSoto*, 476 S.W.3d at 287 (emphasis added). The principal opinion's "foreseeability" analysis, however, appears to rewrite this Court's longstanding general rule to now read: laws based on open-ended characteristics are presumed to be constitutional because some *shall* fall into the classification in the future or some current members *shall* leave it. Further, the principal opinion appears to redefine "foreseeable" to mean "probable." Effectively, the principal opinion disallows open-ended population classifications, previously presumed constitutional, when only one political subdivision currently meets the classification. In my opinion, this restriction of the General Assembly's use of population characteristics is unwarranted and its use of population characteristics in SB 5 is constitutional.

Accordingly, I respectfully disagree with the principal opinion's conclusion that all

three prongs of *Jefferson County* are satisfied. SB 5's population classification does not meet the second and third prongs of the *Jefferson County* test. *See Jefferson Cnty.*, 205 S.W.3d at 870-71. Plaintiffs did not overcome the presumption of constitutional validity of the open-ended population classification in SB 5; therefore, the State did not have the burden to demonstrate substantial justification for the population classification.[2] *See DeSoto*, 476 S.W.3d at 290. The burden was on the Plaintiffs to show the population classification was "arbitrary and without a rational relationship to a legislative purpose," which the Plaintiffs failed to do. *See Jefferson Cnty.*, 205 S.W.3d at 870. The principal opinion should have reversed the trial court's determination that SB 5 contains unconstitutional special laws.

**2.** I agree with the principal opinion that special laws can still be passed by the General Assembly and those laws can survive a special law challenge so long as evidence of substantial justification is offered in the trial court. Here, the State neglected to offer any evidence of a substantial justification.

